[No. 2576. Decided September 10, 1897.]

# THE STATE OF WASHINGTON, *Respondent*, v. THEODORE CUSHING, *Appellant*.

JURY — HOW SUMMONED AFTER EXHAUSTION OF PANEL — HOMICIDE — EVIDENCE — THREATS — INSTRUCTIONS — RIGHT OF ACCUSED TO FACE WITNESSES — TESTIMONY OF DECEASED WITNESS ON FORMER TRIAL.

Where the regular panel has become exhausted before the completion of the jury, the court is authorized, under Laws 1895, p. 140, § 3, to order a second panel of jurors to be drawn and summoned from the regular jury list, and is not required to have the jury completed from among the bystanders, or by the issuance of an open venire.

Proof of an isolated fact, tending to show the great physical strength of deceased, is inadmissible where self-defense is set up in a case of homicide, when such alleged exhibition of strength was never communicated to defendant, or is not a material issue in the case.

A remark by deceased made to others than defendant that, if defendant after hiring him should undertake to run him off with a shotgun, one or the other would die, does not constitute a threat; and the manner of deceased in using such language, and the reason the conversation was carried no further on that subject were properly excluded by the court.

When self-defense is set up as justifying a homicide, an alleged threat by deceased which was not communicated to defendant is inadmissible, as it could have no influence upon his mind in determining the danger he believed himself to be in at the time of the alleged attack upon him by deceased. *(State v. Coella,* 3 Wash. 99, distinguished).

Evidence of threats or of the dangerous character of deceased are inadmissible until there has been proof made of an overt act of attack on the part of the deceased, and that defendant's life was in apparent imminent danger therefrom.

It is within the discretion of the trial judge to determine when a proper foundation is laid for the introduction of threats, and that necessarily involves the discretion to disregard testimony which he cannot, under the circumstances, reasonably believe.

One testifying on a subsequent trial to what a deceased witness testified to on a former trial, may properly identify an exhibit which had been identified by the deceased witness at the former trial and offered in evidence at that time.

Where defendant in a homicide case sets up that he was assaulted by deceased with a club, and a witness who was upon the ground immediately succeeding the killing could find nothing of that character beyond a piece of lath sprinkled with blood, the lath is admissible in evidence on the part of the prosecution.

Testimony of a witness that certain holes in deceased's clothing corresponded to the holes in his body as seen and examined by the witness soon after the homicide is admissible as evidence of facts and not merely the expression of an opinion.

The fact that the court in explaining to the jury what constitutes manslaughter states that if the killing was done in a sudden excitement, without thinking of what effect his act may have upon his adversary, the act would constitute manslaughter, would not be prejudicial when followed by the language of the statute defining the crime.

The lower court, upon a re-trial, is not bound to give a requested instruction, which the supreme court had on appeal declared to have been improperly refused, in the exact language as it was passed upon and approved by the supreme court, but it is within the discretion of the trial court to add language explanatory thereof.

It is not error to refuse a request for an instruction, when the one given by the court upon the point covers the ground, although in other language.

In charging the jury in a criminal case it is not the duty of the court to address its instructions to each one of the jury as individuals, but it is sufficient to state the law as it applies to the duties of the jury as a collective body; the proper recourse when there is doubt as to whether the verdict was concurred in by each individual juror is to poll the jury.

A request to charge that proof of good character is admissible not only in a case where doubt otherwise exists, but may be offered for the purpose of creating a doubt was properly refused, where evidence of good character had been admitted by the court and the jury charged to consider it with the other evidence, since it is not incumbent upon the court to enlighten the jury upon abstract propositions of law.

The constitutional provision that the accused in a criminal prosecution shall have the right to meet the witnesses face to face will not exclude evidence of the testimony given by a deceased witness upon a former trial, as the accused has once had the advantage of seeing the witness face to face and of subjecting him to cross-examination.

35—17 WASH.

Appeal from Superior Court, Spokane County.—Hon. NORMAN BUCK, Judge.   Affirmed.

*Blake & Post*, and *Winston & Winston*, for appellant.

*J. W. Feighan*, Prosecuting Attorney, for The State.

The opinion of the court was delivered by

ANDERS, J.—Appellant was tried upon an information charging him with murder in the first degree by shooting and killing one Thomas King in the county of Spokane. He was convicted of murder in the second degree and sentenced to the penitentiary for the term of ten years, and upon appeal to this court the judgment was reversed and the case remanded for a new trial.   Upon the second trial he was convicted of manslaughter and sentenced to the penitentiary for the term of seven years, and he has again appealed to this court.

Appellant admits having killed King, but claims that he did it in self-defense.   The facts disclosed by the record are briefly these:   King was in the employ of appellant as an ordinary farm laborer on appellant's premises near Spokane, from November, 1894, until May 14, 1895, the day of the homicide.   During this time King boarded and lodged on an adjoining farm with one William Seaton. On the morning of May 14th, King went with Seaton to the Cushing farm at about seven o'clock and assisted Mr. Hampton, appellant's father-in-law, in milking the cows. But it does not appear that he did anything thereafter. During that forenoon Mr. Seaton was engaged in taking up, cleaning and replacing carpets, and appellant, during the same time, was employed in and about the barn yard and poultry yard in caring for his poultry.   He and King were seen together several times during the forenoon, but there seems to have been no quarreling seen, or loud or

violent language heard by either Seaton or Mr. Hampton, who was also about the house and premises until some time near the middle of the forenoon. At about half past eleven o'clock, or a little later, Seaton concluded to go home to prepare his dinner. Having passed out of the house through the west door, he noticed King standing at or near the southwest corner of the house, and asked him if he was going home, and King replied, in an ordinary tone of voice, " No, I am not going until twelve o'clock." At this time appellant Cushing was at the well some distance north of the door above mentioned. Seaton went in a northerly direction, walking rapidly for about one hundred and fifty yards, when he met Mr. Hampton who was unloading a load of gravel on the road. He stopped and spoke to Mr. Hampton, and almost immediately heard the report of a gun in the direction of the house, and a very short time thereafter he heard a second report, and immediately Mrs. Cushing and her mother, Mrs. Hampton, were heard screaming. Both Seaton and Mr. Hampton immediately started for the house, Mr. Seaton running, as he says, " as fast as he could go," and arriving some distance in advance of Mr. Hampton. On reaching the house he discovered King lying in a path on the east side, and perhaps a little north, of the house, wounded, bleeding and helpless. King was then lying in the sun and requested Seaton to take him and put him in the shade, which Seaton accordingly did. Mr. Hampton arrived about this time and in a few moments thereafter Cushing appeared upon the scene. King was very much " shocked and weakened," but was not unconscious. When Cushing appeared Mr. Hampton asked him why he had done this and brought disgrace upon the family, or words to that effect. Whereupon Cushing replied, " I had to do it. I acted in self-defense.

He was pursuing me with a club." King then said, " Why
didn't you pay me?" Some other conversation was had
at the time, but neither Hampton nor Seaton was able
to recall what further was said by King or Cushing. Soon
after this conversation Mr. Hampton proceeded to make
an examination .of that part of the premises where the
tragedy was supposed to have occurred, and he discovered
a pool of blood about the size of one's hand near a little
pine tree standing about twenty-four feet south of the cen-
ter of the house, and at the same place picked up a piece
of ordinary lath with blood stains upon it. Upon this
tree there was a fresh scar, or mark, which appeared to
have been made by a bullet or buck-shot. Before Mr.
Hampton went to look for " a piece of lath," King was
placed upon a sofa on the porch on the north side of the
house. Seaton then removed King's overalls and drawers
and discovered that the first charge that was fired had taken
effect in the back portion of his thighs extending down as
far as the knees. The second was found to have penetrated
King's back a little below the kidneys and about two
inches to the right of the spinal column, two buck-shot
having passed through the body and nine shots having
struck so close together that the wounds caused by them
covered a space " about the size of a dollar." No weapons
of any character or description were found upon King at
the time his clothing was removed, and no club or stick
or weapon was found at or near where he was lying when
discovered by Seaton on his return to the house. In fact,
no club or stick, except the piece of lath above mentioned,
was ever found by any one about the ground over which
King must have traveled before he fell. In addition to
the gunshot wounds which appeared upon the body of
King, there was a wound about an inch or two long and
of a triangular shape upon the left side of his head which

penetrated to the skull. This appeared to have been inflicted with some blunt instrument and probably with the gun with which the shooting was done, as the barrel, upon examination, was found to be bent.

The above were the facts and circumstances in evidence when the state rested its case, and we have stated them somewhat minutely for the reason that it will become necessary to advert to them hereafter. On the trial appellant was examined as a witness on his own behalf and testified that on the morning in question King came to the poultry house where he was attending to his chickens and demanded payment of his wages. Whereupon defendant told deceased that he did not have the money to pay him; that he would do so on the following day, or in a day or so thereafter; that thereupon the deceased became abusive and threatened defendant with violence; that he continued to follow defendant from place to place about the poultry yard and barn yard from about half past seven in the morning until 11:30 A. M., when the shooting occurred. Defendant further testified that he repeatedly ordered the deceased from his premises and that he refused to go; that King continued to become more violent, and that, becoming alarmed and fearful for his own safety, the defendant went into his house and procured his shot gun for the double purpose of defending himself against any attack that King might make upon him, and in the belief that, finding him armed, King would withdraw from the premises; that when he appeared outside of the house with the gun the deceased rushed upon him armed with a club uplifted in his hand; that thereupon defendant fired, aiming low with a view to disabling him, not to kill him; that the instant the shot was fired, King raised his head up and came at defendant with the club uplifted and muttering curses, and defendant, thinking that King had not been

hit, immediately proceeded to re-load. Continuing witness said: "During the time that I was reloading he had gotten up to just a few feet of me, I don't think it was over eight or ten feet, and when I fired this time he repeated his movement (that is, ducking his head and turning his body), only this time he bent further down." King expired in about four hours after receiving the wounds.

When the cause was called for trial there was in attendance upon the court a full panel of the regular jury consisting of twenty-four men, but before the jury was completed the regular panel became exhausted and the court, upon motion of the prosecuting attorney, ordered the drawing and summoning of another panel of twenty-four men from the jury list certified by the clerk of the county commissioners. The defendant objected to this proceeding, and also moved to quash the venire issued for the second panel, contending that if any venire was to be issued at all it should be an open one. It is now contended that the court erred in ordering the drawing of another panel and in overruling the motion to quash the venire, and in support of his position appellant cites sections 1297, 63, 64 and 339 of vol. 2 of Hill's Code, and section 3, p. 140, of the Session Laws of 1895, as well as *State v. Payne,* 6 Wash. 563 (34 Pac. 317), and *State v. Holmes,* 12 Wash. 169 (40 Pac. 735), and other cases.

Section 1297 of the Code provides that "except as otherwise specially provided, issues of fact joined upon an indictment or information shall be tried by a jury of twelve persons, and the law relating to drawing, retaining and selecting jurors, and trials by jury in civil cases, shall apply to criminal cases." Section 63 provides that if for any cause the court shall see fit to set aside the venire for grand or petit jurors, . . . an open venire may thereupon issue to the sheriff who shall thereupon complete the

panel by such open venire as speedily as possible." And
in section 64 it is enacted that "if for any cause a sufficient
number of grand or petit jurors are not returned by the
sheriff in the manner first herein contemplated, or if a
sufficient number of grand or petit jurors are not in at-
tendance, the court may order the panel filled by summon-
ing a sufficient number by an open venire issued and di-
rected to the sheriff." It will be observed that neither of
the two sections last above mentioned is directly applicable
to the case in hand. But it is especially urged that the
action of the court complained of was in contravention of
section 339 of the Code, which provides that "if the bal-
lots become exhausted before the jury is complete, or if
from any cause a juror or jurors be excused or discharged,
the sheriff, under the direction of the court, shall summon
from the bystanders, citizens of the county, as many qual-
ified persons as may be necessary to complete the jury;"
and that "whenever it shall be requisite for the sheriff to
summon more than one person at a time from the bystand-
ers or body of the county, the names of the talesmen shall
be returned to the clerk, who shall thereupon write the
names on separate ballots and deposit the same in the trial-
jury box, and draw such ballots separately therefrom, as
in the case of the regular panel." Section 3, page 140,
of the act of 1895, relating to the drawing of grand and
petit jurors, provides that, "until otherwise provided for,
each judge of the superior court may order, at such times
as he deems necessary, a panel of not less than twelve nor
more than twenty-four grand or petit jurors, to be drawn
from the last jury list certified by the clerk of the board
of county commissioners," etc. And the first proviso in
said section states that, "if from any cause the jurors in
said list shall have been drawn before the list for the next
succeeding year shall have been prepared and certified to

the clerk as aforesaid, an open venire may issue to the sheriff for the requisite number to constitute a panel of grand or petit jurors, returnable at a day and hour to be named by the judge." And it is claimed by the learned counsel for the state that these provisions of the act of 1895 repeal section 339 of the Code. We are of the opinion that counsel is in error in that regard. The act of 1895 is, in our judgment, not inconsistent with section 339, and does not in terms purport to repeal it. But we think it fully authorized the trial judge to order a second panel of jurors to be drawn and summoned from the regular jury list whenever he deemed it necessary to do so; and there is nothing in the case which shows or suggests that the trial judge did not properly exercise his discretion in this instance.

In the case of *State v. Payne*, the question was whether the deputy sheriff was authorized by the statutes there considered to assist in drawing the jury list, and this court held that he was not, and that the substance of the law had not been complied with and, consequently, that the jury there objected to was not a legal jury. But no such question arises here. For aught that appears in the record the jury was properly selected, drawn and summoned.

In *State v. Holmes*, this court held that, under section 339 of the Code, when the jury list has been exhausted before the completion of the jury, the jurors may be summoned from the bystanders even if some of those drawn may have failed to appear, as the presumption is that they have been properly excused by the court. In that case we simply recognized the validity of the section referred to. We still think that, if the court in this case had proceeded in accordance with § 339 it would have committed no error, for the reason that this section and § 3 of the act of 1895 may both stand together as co-existing laws.

On the trial in the court below the defendant offered to prove by one T. D. Weger that on a certain occasion the deceased exhibited great physical strength in lifting a hog into a wagon. The court refused the offer and the refusal is assigned as error. Appellant asserts that it is always competent, where self-defense is set up in a case of homicide, to show the relative strength of the parties. But we think that that is not a rule of universal application. This alleged exhibition of strength on the part of King was never communicated to appellant and, if his testimony is true, it is difficult to perceive the importance or materiality of King's physical strength.

In *Stephenson v. State*, 110 Ind. 358 (59 Am. Rep. 261, 11 N. E. 360), cited by appellant, which was a homicide case, it appeared that the defendant and the deceased had been engaged in a fight and that the defendant killed his antagonist by stabbing him with a knife; and in that case, as it will readily be seen, the question of the relative strength of the parties was pertinent and important.

In *State v. Knapp*, 45 N. H. 148, one of the most material questions in the case was whether the prosecutrix was or was not physically able to resist the assault claimed to have been made upon her by the defendant. And in *Hurd v. People*, 25 Mich. 404, the defendant was charged with killing one Hubbard, who had shaken him, thrown him down upon the ground and then pursued him into his house through the dining-room and into a bedroom where Hurd stopped and fired the fatal shot. The court in that case held that it was error to refuse the defendant the right to show that Hubbard was high-tempered and quarrelsome. But that was a case where the question now under consideration became material in order to determine whether defendant did or did not have reason to believe that he was in danger of losing his life or receiving great

bodily injury unless he defended himself in the manner he did. In *Wellar v. People*, 30 Mich. 16, a case also cited by the appellant, the defendant was charged with having killed the woman either by a blow or by kicking her to death, and the court held that it was competent to show the physical strength of the respective parties, but stated expressly that it is objectionable to prove these things by specific acts. While in *Stephenson v. State* and *State v. Knapp*, it was held proper to show special tests of strength, we think that the better doctrine is that such testimony should not be received except, perhaps, on cross-examination, to show the knowledge of the witness.

In 9 Am. & Eng. Enc. Law, pp. 683-685, it is stated that

" The reputation of deceased as a violent, quarrelsome, turbulent, dangerous or vindictive man, or of his habit of going armed, is admissible under the plea of self-defense, where the evidence does not conclusively show that the defendant was solely in fault, and that he had no reason to fear that his life or safety was in danger from deceased. But such evidence is admissible only where the proof leaves open the question of self-defense; and then it must be proved, not by opinions of witnesses, but by evidence of reputation. Nor can such reputation be proved by evidence of special acts of violence or turbulence, or of isolated facts, which are not part of the *res gestae.*"

This text is supported by numerous authorities, and it would seem that, where the question is as to the relative strength of the respective parties to an encounter, the same general rule should be adopted.

In the course of the trial Mrs. Levora Weger was called as a witness for the appellant and testified that on the occasion of a visit to their house in November, upon an errand for Cushing, King, while seated at the dinner table, said, in effect, that he understood Cushing had been in

the habit of hiring men and running them off with a shot gun; that if he ever undertook to run him off with a shot gun either he or Mr. Cushing would die. After having given this testimony the witness was asked the question, "What was the manner of King at the time he used this language towards Cushing?" The state objected to this question, and the objection was sustained, and the defendant excepted. It is not claimed that this conversation was ever repeated to Cushing, and it is therefore urged by respondent that the manner of King at the time he used the language stated was wholly immaterial. We fail to see any error in this ruling of the court. There is nothing in the language used tending to show that King entertained any grudge or ill will against Cushing, and, under the hypothetical state of facts mentioned, King would have had a perfect right to defend himself against such supposed attack to the last extremity. If this testimony was adduced for the purpose of showing that King had made a threat against Cushing, we think it might have been properly excluded, simply upon the ground that it constituted no threat at all. "A threat in criminal law," says Black in his Law Dictionary, " is a menace, a declaration of one's purpose or intention to work injury to the person, property or rights of another." The only purpose indicated by the language alleged to have been used by King was to defend himself in case Cushing attacked him with a shot gun, as he had understood others had been attacked by him. On the cross-examination of Mrs. Weger she testified that the conversation above mentioned was carried no further, or, if it was, she did not remember anything more that was said. The prosecuting attorney asked no further questions in regard to this conversation, but counsel for the defendant asked the witness, in effect, what was the reason that the conversation was dropped at that point. The

court sustained an objection to this question, and in so do-
ing we think committed no error.

On the trial the defendant offered to prove by one W.
C. Durham that a month or six weeks prior to the homi-
cide, King was at witness's blacksmith shop in the village
of Mead for the purpose of having a team of horses be-
longing to appellant shod, and that some question having
arisen as to payment for the work, King said to witness,
" You put the shoes on and I will pay the bill, and if I
can't get it in any other way I will take it out of Cush-
ing's hide." This testimony was excluded by the court on
the ground, as stated, that it " does not amount to a threat."
And in our opinion the court was right. It is claimed,
however, that this ruling is contrary to the decision of this
court in *State v. Coella*, 3 Wash. 99 ( 28 Pac. 28). In
that case the language attempted to be proved by the de-
fendant was, " If Coella keeps on talking about my owing
him money, I will kill him." This threat was communi-
cated to Coella, and the court, in passing upon the ques-
tion, said:

" It was a circumstance to be considered in connection
with the attack which he claimed was made upon him by
the deceased, not as any evidence of the attack, but as
likely to have had some effect upon and tending to show
the condition of his mind when attacked as to the danger
he was in or believed himself to be in."

In the case at bar the alleged threat was not communi-
cated to appellant and therefore could not have had any
influence upon his mind in determining the danger he was
in, or believed himself to be in, at the time he alleges
he was attacked by King.

At the close of the evidence upon the part of the state,
which we have above set forth, appellant offered to prove
by the witness W. J. Newman certain threats made by

King against Cushing, but the same were excluded by the court upon the ground that a sufficient showing had not been made that the deceased was assaulting defendant at the time the shots were fired. The defendant was then placed upon the witness stand and testified concerning the attack upon him by King, and thereafter said Newman was allowed to give evidence of the threats in question. It is strongly contended by the learned counsel for appellant that the exclusion of this testimony constituted error for the reason that, as the evidence then stood, the defendant had a right to have the case submitted to the jury upon the theory of self-defense. It seems to be a pretty well settled proposition of law that proof of an overt act of attack on the part of the deceased, and that defendant's life was in apparent imminent danger therefrom is a prerequisite to the admission of evidence of threats or of the dangerous character of the deceased. *State v. Jackson*, 37 La. An. 896; *State v. Ford*, 37 La. An. 443; *State v. Janvier*, 37 La. An. 644; *State v. Labuzan*, 37 La. An. 489; Wharton, Criminal Evidence (9th ed.), § 757.

See, also, *West v. State*, 18 Tex. App. 640.

And it is for the trial judge to determine when a proper foundation is laid for the introduction of threats, and that necessarily involves the discretion to disregard testimony which he cannot under the circumstances reasonably believe. *State v. Jackson, supra; State v. Ford, supra; State v. Janvier, supra.*

In *State v. Ford* the court says:

" Without such authority [meaning the discretion just mentioned], which is not arbitrary, but involves the exercise of sound, legal discretion, the trial judge would be a mere automaton, or at most in the attitude of the presiding officer of a deliberative assembly with no greater pow-

ers than those of announcing the utterances or conclusions of others.''

The court in this case determined from all the facts before it that no sufficient foundation had been laid for the introduction of the evidence offered, and we are not prepared to say that it arrived at a wrong conclusion. It is true that it had been shown by the self-serving declaration of Cushing in the presence of Seaton, Hampton and King, after the fatal encounter had taken place, that he said he had to do it, he was acting in self-defense. But it must have been the conclusion of the trial judge from all the facts and circumstances in evidence that there was at least a strong probability that the assertion was not true. Indeed, we think that the court might have properly refused, and probably did refuse, to consider that declaration at all, upon the ground that it appeared at least open to the suspicion that it was part of Cushing's plan of defense. Wharton, Criminal Evidence, § 691.

At the trial, the state having shown that Thomas Hampton, a witness on the first trial, had died, the stenographer's typewritten report of his testimony was read to the jury on the second trial. In that testimony the witness Hampton said that, some twenty or thirty minutes after the shooting, he went around where the shooting was supposed to have occurred and picked up a small piece of lath, which was identified by him on the former trial and exhibited to the jury. One S. A. Wells, deputy prosecuting attorney, was then called as a witness and testified that he was present in court on the first trial, when Hampton testified as to the lath and identified it as the one picked up by him. Wells was permitted to testify, over the objection of defendant, that the lath then shown to him was the same lath which was identified by Hampton on the last trial, and that he saw it offered in evidence at that time. The lath

was thereupon admitted in evidence and exhibited to the jury and appellant now complains of the action of the court in that regard. His contention is that this lath had no pertinent relation whatever to the killing, and therefore should not have been introduced in evidence. But we think, when viewed from the standpoint of the prosecution, that it was proper evidence to go to the jury for what it was worth. The theory of the prosecution was that King made no attack whatever upon Cushing at the time of the homicide and had no weapon of any kind at that time, or if he did have anything at all in his hands, it appeared from the facts and circumstances in evidence that it could have been nothing but this piece of lath, which the prosecuting attorney evidently did not consider a dangerous weapon.

It is further contended that the court erred in permitting Doctor Newman, a witness for the state, to give his opinion that certain holes in the clothing which was exhibited to the jury corresponded with the number and position of the wounds in the hip of the deceased. It appears from the evidence that Doctor Newman had seen and examined the wounds upon the body of King soon after the homicide was committed, and had noticed the character of these wounds upon the back as to being close together or " bunched," and he simply stated when upon the witness stand that the holes in the body of King corresponded, according to his recollection, with those in King's garments which he had before him at the time. We think the doctor was not expressing an opinion but simply detailing facts.

Appellant also insists that the court erred both in the instructions given to the jury and in refusing to instruct as requested by defendant. It appears that after the court had defined malice and murder in the second degree it made the following statement to the jury:

" If, on the contrary, during the controversy, in a sudden excitement, but without any ill will or malice, without, perhaps, thinking of what effect his act may have upon his adversary, without any deliberation or premeditation, without any necessity, or without any apparent necessity to defend himself from his adversary, he shoots and kills his adversary, the act would constitute manslaughter because there would be no malice or deliberation or premeditation in the act."

This explanation as to what would be manslaughter was followed by a quotation from our statute defining the crime of manslaughter, and we hardly think, in view of that fact, that the jury could have been misled to appellant's prejudice by the explanatory remarks above quoted.

The court was requested by the defendant to give to the jury the same instruction upon the right of self-defense which was requested and refused upon the first trial and which refusal this court held to be error. The instruction was given as requested, but the court afterwards observed:

" The jury will observe that in the above instruction it states that it was not sufficient for the defendant to honestly believe himself in danger, but he must have reasonable ground also to believe that it was necessary for him to use the means which he did use in order to protect his life or protect himself from great bodily injury."

The appellant insists that it was error to give this explanation of the instruction to the jury because it was the duty of the court to give the instruction in the very terms approved by this court, and no other. But while there probably was no necessity for the explanation given by the court, we are unable to perceive either that the court abused its discretion in the matter or that the appellant could have been prejudiced by such explanation.

Upon the question of reasonable doubt the defendant requested the court to instruct the jury as follows:

"A reasonable doubt within the meaning of these instructions may be defined as follows: It is such a doubt as a man of ordinary prudence, sensibility and decision, in determining an issue of like concern to himself as that before the jury is to the defendant, would allow to have any influence whatever upon him, or make him pause or hesitate in arriving at his determination. If, therefore, you feel such hesitancy in this case, or lack an abiding faith in the guilt of the defendant, you will give him the benefit of the doubt and acquit him. Such a doubt must arise from a full and fair consideration of all the facts and circumstances disclosed by the evidence and may arise not only from the evidence but from a want of evidence as well."

This is practically the same instruction that was requested and refused by the court in the case of *State v. Gile*, 8 Wash. 12 (35 Pac. 417), and in which such refusal was sustained by this court on the ground that the instruction there given, and which is the same instruction that was given by the court in this case, was sufficient. It is claimed, however, that this court in the later case of *State v. Krug*, 12 Wash. 288 (41 Pac. 126), approved an instruction similar to that requested by the appellant here. It will be seen, however, by a reference to the opinion of the court in that case that the only criticism made of the instruction was that it assumed that there might be a doubt in the minds of the jury that would be a speculative, conjectural or an imaginary one, and the court said:

" We do not think there is anything in the instruction that would warrant the conclusion that there was any such an assumption, or that it could be deduced that the court thought if there was a doubt that such doubt would be speculative, conjectural or imaginary."

It is thus seen that the court simply passed upon the question there raised and did not consider whether the par-

ticular instruction as a whole was or was not a proper one.

The court was further requested to give instruction No. 17 asked by the defendant, which is as follows:

" 17. Defendant is presumed to be innocent until his guilt is established by such evidence as will exclude every reasonable doubt; therefore the law requires that no man shall be convicted of a crime until each and every one of the jury is satisfied by the evidence in the case to the exclusion of all reasonable doubt that the defendant is guilty as charged. So in this case if the jury entertain any reasonable doubt of the defendant's guilt they should acquit him; or if they entertain any reasonable doubt as to whether he was excusable and justifiable in the acts complained of, they should acquit; or if any one of the jury after having fully considered all of the evidence and after having consulted with his fellow jurymen and candidly considered their views with the purpose of reaching a just conclusion, should entertain such reasonable doubt, the jury cannot in such case find the defendant guilty."

This instruction is substantially similar to a request by the defendant in *State v. Robinson*, 12 Wash. 491 (41 Pac. 884), which was refused by the court, but was modified and then given as modified. This action of the court below was held to have been proper. Upon this question the court said:

" The claim of error founded on this action of the court must be denied for at least two reasons; one, that it was not the duty of the court to address its instructions to each one of the jury as individuals; it was sufficient if the law was correctly stated as it applied to the duties of the jury as a collective body."

The decision in *State v. Robinson* was reaffirmed by this court in *State v. Williams*, 13 Wash. 335 (43 Pac. 15).

Moreover, our statute provides that where there may be a doubt as to whether the verdict is concurred in by each individual juror, the fact may be ascertained and settled by

polling the jury. Code Proc., § 371. Upon the other propositions involved in this request we think the jury was sufficiently instructed.

The court was also requested to charge the jury that good character is admissible not only in a case where doubt otherwise exists, but may be offered for the purpose of creating a doubt. This instruction was refused and, as we think, rightly. It may be true as an abstract proposition of law, as stated in *People v. Jassino*, 100 Mich. 536 (59 N. W. 230), cited by counsel, that evidence of good character may be offered for the purpose of creating a doubt, but, in our judgment, where evidence of good character has been admitted by the court and the jury charged to consider it with the other evidence in arriving at their verdict, it is not necessary for the court to further state to the jury the purpose for which such evidence *may be admitted*. The statute requires the court simply to instruct *the jury* as to the law in the case, and, when the court has done that, it is not incumbent upon it to enlighten the jury upon abstract legal propositions.

Lastly, it is claimed that the court erred in admitting the testimony given on the former trial by the deceased witness, Thomas Hampton, and it is urged with much earnestness on the part of counsel that the action of the court was an infringement of § 22 of art. 1 of the constitution, which provides that in criminal prosecutions the accused shall have a right to meet the witnesses face to face. In support of their contention counsel cite the case of *Cline v. State* (Tex.), 36 S. W. 1099, wherein the majority of the court held, under a constitution providing that the accused had a right to be confronted by the witnesses, that testimony of a deceased witness given on a former hearing was inadmissible. No other case is cited by appellant, and it seems that the overwhelming weight of authority is to the con-

trary.   See *State v. Elliott*, 90 Mo. 350 (2 S. W. 411);
*Mattox v. United States*, 156 U. S. 237 (15 Sup. Ct. 337);
*State v. Johnson*, 12 Nev. 121; *State v. Wilson*, 24 Kan.
189 (36 Am. Rep. 257); 1 Bishop, New Criminal Proce-
dure, §§ 1194-1204; Cooley, Constitutional Limitations
(5th ed.), p. 388; Wharton, Criminal Evidence, § 227;
1 Greenleaf, Evidence, § 163.

In *Mattox v. United States, supra*, all of the decisions
up to that time seem to have been examined and
cited by the court, and it was held, in effect, by all
the judges that such evidence was not intended to be ex-
cluded by the constitution.   As was said in that case, " the
substance of the constitutional protection is preserved to
the prisoner in the advantage he has once had of seeing
the witness face to face and of subjecting him to the ordeal
of a cross-examination."

The appellant was defended by able and watchful coun-
sel and, we think, had a fair trial, and the judgment and
sentence is therefore affirmed.

SCOTT, C. J., and REAVIS, DUNBAR and GORDON, JJ.,
concur.