The appellant was indicted pursuant to § 13A-5-40(a)(5), Codeof Alabama 1975, for the capital offense of the murder of a law enforcement officer. The appellant pleaded not guilty and not guilty by reason of insanity. Following a jury trial, the appellant was found guilty as charged in the indictment. Thereafter, the jury returned an advisory verdict of life imprisonment without parole, by a vote of 12 to 0. A proceeding was then held before the trial court, following which the trial judge sentenced the appellant to death.
The record indicates that the appellant is a white male, who was approximately 52 years old at the time of the offense. The appellant has a fourth or fifth grade education and is illiterate. He has a long history of alcohol abuse, which worsened after his first wife committed suicide. The appellant remarried, and his second wife died of a heart attack. The chief of police of Robertsdale testified that, during the 12 years prior to the appellant's trial, he had committed 32 alcohol-related offenses in the City of Robertsdale. Several of these offenses, though many did not result in convictions, were potentially violent: e.g., *Page 147 
assault, reckless endangerment, and criminal trespass. The appellant was known to have threatened suicide on a number of occasions, and the appellant's sister-in-law, who testified for the State, indicated that the appellant often had "very severe" headaches, during which he would bang his head against the wall and, that on one occasion, he had tried to jump out of a moving car in order to stop the pain.
In 1981, the appellant was living in a 10 foot by 12 foot shack, located close to his mother's house. The appellant brought a gallon of gasoline to his shack and poured the gasoline over himself and around the shack. The appellant then attempted to kill himself with a "Bic" lighter, but, as the police later explained to him, he was unable to do so because he had wet the flint with the gasoline. An unidentified individual notified the police of the appellant's actions, and the police arrived and arrested the appellant for attempted arson. The appellant was then informed by his attorney that, if he agreed to plead guilty, he would be sentenced to only 5 years, whereas if he pleaded not guilty he would receive a 20-year sentence. The appellant pleaded guilty and was imprisoned for one year, the remaining four years to be served on probation.
The court records indicate that the appellant's probation was revoked because he committed the offenses of public intoxication and DUI and he failed to report to his probation officer. The appellant was imprisoned to serve the remainder of his sentence. While in prison, the appellant suffered two heart attacks. While the appellant was in the hospital, recovering from the second heart attack, his family was mistakenly notified that he had died. Soon after the second heart attack, on August 8, 1987, the appellant was released from prison.
There was testimony that, upon his release, the appellant attempted to change his life by becoming involved in religion. He often went to church with Neil Turberville, who owned Hub City Tires, and Turberville's wife. There was testimony that the appellant was attempting to abstain from alcohol. He began living with a woman, although he spent certain nights at home with his mother. The appellant had difficulty finding work and applied for SSI benefits from the government. On September 30, 1987, the day prior to the instant offense, the appellant's girlfriend apparently loaded his belongings in her car and dumped them out on the street, several houses down from the appellant's mother's house.
On the morning of the offense, October 1, 1987, the appellant went to the grocery store and returned to his mother's house, where he made sandwiches for his young nephews. One of his nephews, who was approximately three years old, was sitting on the front porch of the house, eating his sandwich, when a black dog approached the child, ate the sandwich, and bit the child on the hand. The appellant became extremely upset and ran to get his father's shotgun; however, there was no ammunition in the gun. The appellant then stated that he intended to kill the dog.
At this time, the appellant began to attempt to fix his mother's commode. There was testimony that, each time he fixed one leak, another would appear. The appellant had to make many trips to the hardware store to get parts for the commode. In doing so, he would pass the liquor store. On one occasion, he stopped and bought a bottle of vodka and took it to an area in an alley behind his mother's house. The appellant referred to this area as his "stash" and testified that he was not allowed to drink in the house and and he, therefore, would always take his liquor to his "stash" to drink it, because he could get drunk there, go to sleep, and no one would bother him. The appellant subsequently bought a pint of Mad Dog 20/20 wine.
The appellant's sister-in-law testified that the appellant received a letter that day from the government denying him certain benefits he had requested. She testified that the appellant had threatened suicide, but that she believed he was kidding.
His sister-in-law testified that he became extremely upset and eventually got a severe headache. She observed him pick up *Page 148 
a pipe wrench and hit himself in the head with the wrench and cry out for help. Neil Turberville testified that he observed a wound on the appellant's head later that day. After hitting himself in the head with the pipe wrench, the appellant asked for help. Mrs. Turberville was summoned to the house, and the appellant poured out the rest of his bottle.
At approximately 4:00 in the afternoon, the appellant went to Campbell's hardware store where Deputy Sheriff Carl Cherry, of the Baldwin County Sheriff's Department, observed the appellant buying buckshot. Deputy Cherry testified that he knew the appellant, although he had believed that the appellant had died in prison. He testified that, after they exchanged some small talk, he asked the appellant if he was buying the five shotgun shells to hunt deer, and that the appellant responded that he was buying the shells for people.[1] Deputy Cherry testified that he believed the appellant was kidding when he made that response. He further testified that he did not believe that the appellant had been drinking.
At approximately 5:00 that afternoon, the appellant went to Turberville's shop and asked to speak with their pastor. Neil Turberville testified that he did not believe that the appellant was drunk; however, he knew that he had been drinking and that he had not drunk for a long time. He testified that the appellant was crying and appeared to be very depressed and upset. Minister Nabors came to Turberville's shop and prayed with the appellant for about an hour. The appellant returned to his mother's house, where he asked his sister-in-law about a half-gallon of Thunderbird wine that she had in her car. She testified that his mood had been up and down during the course of the day and that, when he went outside to get the wine, she heard him say, "May God forgive me for what I am about to do." Three or four minutes after he left, she testified that she heard a gunshot.
Thereafter, somewhere between 6:30 and 7:00 p.m., the appellant went to a pool hall, owned by Lavonia "Tugi" Duckworth, who had known the appellant for years. She testified that the appellant was in the pool hall until approximately 9:00 p.m.; however, he left once for a period of time. She testified that he made several phone calls to his girlfriend and thereafter called his son long-distance and simply told him, "Good bye." She testified that approximately 10 minutes later, the appellant's son telephoned her pool hall, concerned about his father. She testified that the appellant behaved very oddly and began preaching at people in the pool hall. She testified that the appellant had previously had an altercation with her son and, during the course of his preaching, that he approached her son and stated that, when he had first gotten out of prison, he had come back with the intention of killing a man, but that now he knew that it was wrong to kill. Duckworth testified that the appellant "was different from any J.C. Hadley that I had ever known." She stated that, while at the pool hall, the appellant drank Coca-Cola and that, although she could not smell alcohol, he could have been drinking. The appellant testified that when he left the pool hall that one time, he returned to his "stash" and continued to drink the wine. He testified that a friend walked by with some beer and gave him some.
The appellant stated that, after he left the pool hall for the last time, he remembered nothing for the rest of the night. Testimony established that after he left the pool hall, the appellant went into a Junior Food store, where Teresa Scott was working. Ms. Scott testified that she knew the appellant, as he had been in the store a number of times. She further testified that he had been in the store approximately four times that day and that each time he came into the store he stated that he intended to kill himself. The last time the appellant entered the store, he stated that he was going to kill himself and instructed Ms. Scott to call the police in 5 or 10 *Page 149 
minutes, because he did not want any "piss ants crawling on" him. Teresa Scott testified at trial that she did not believe the appellant had been drinking; however, the statement of the dispatcher with the police department, who took the telephone call from Teresa Scott, was introduced into evidence, and it indicated that Ms. Scott informed the police that the defendant had been in the store three or four times that evening, had been drinking heavily, and had threatened suicide.
When the appellant left the Junior Food store, he walked back to his "stash" in the alley, which ran behind as well as his mother's house (the Junior Food store). Sergeant Bishop, of the Robertsdale Police Department testified that he was in the area at the time of the dispatch, and that he arrived on the scene approximately one minute after the call. He testified that he knew the appellant and that, as he approached the alley, he shined the lights from the top of his patrol car into the alley, because it was very dark. He testified that he spotted the appellant sitting on a concrete slab and holding a shotgun in his lap. Sergeant Bishop testified that he sped pass the appellant and radioed for back-up. Very soon afterwards, Officer Hamilton of the Robertsdale Police Department arrived on the scene. Within approximately four minutes, Howard Dutton and Jim Stallworth, both of the Baldwin County Sheriff's Department, arrived on the scene, followed by Chief Williams and Officer O'Bannon, both of the Robertsdale Police Department. Deputy Howard Dutton indicated that he knew the appellant and wanted to talk to him. There was evidence introduced that Deputy Dutton and the appellant had been friends for some time; that Deputy Dutton had been to the appellant's house on a number of occasions; that the appellant referred to Dutton as "Wild Bill" because of his guns; and that the appellant had done a number of odd jobs around Dutton's residence. The appellant began telling the officers not to come out and to leave him alone. The appellant threatened to kill the officers if they came toward him. Chief Williams testified that the defendant gave "no signs of recognition" of any of the officers or that the individuals were officers.[2] Deputy Dutton and Chief Williams began talking to the appellant and telling him to put the weapon down and come out and talk. The appellant apparently heard Sergeant Bishop, who was located behind him, and threatened to kill him if he continued to approach from the rear. Deputy Dutton then stated to the appellant, "J.C., it is me, Howard, you know me." The appellant responded, "I cannot see who you are. Please step out where I can see you." Deputy Dutton then, holding the only flashlight at the scene, walked past Chief Williams, who had begun to emerge from behind the wall of the building located at the end of the alley, and stepped out into the open. The appellant then shot Deputy Dutton in the left side of his abdomen, and the deputy was killed instantly. Chief Williams and Sergeant Bishop then shot the appellant, who was then transported to the hospital.
Deputy Dutton's gun was secured in his holster during the transaction. There was testimony from the officers that the appellant's shotgun appeared to track Deputy Dutton as he walked into the open. Officer Hamilton testified at trial that the appellant was holding the shotgun in the "hip firing position." However, in a prior statement, Officer Hamilton indicated that he never fired on the appellant, "since Hadley was still holding at waist level, I thought maybe he was surrendering." A half-gallon bottle of Mad Dog 20/20, which was approximately half empty, and eight "tall-boy," or 16-ounce, Budweiser cans were also recovered; one of the cans was half empty.
The offense occurred shortly after 10:00 p.m. An expert from the Alabama Department of Forensic Sciences testified that the appellant's blood-alcohol level was determined to be .173% when he arrived at the hospital at 12:02 a.m. The expert testified that, based on the one-and-a-half hour interval between the alcohol consumption *Page 150 
and testing, as well as the intravenous fluids that were administered before the testing, the appellant's blood-alcohol probably registered . 196% to .20% at the time of the offense. The expert stated however, that that estimate was calculated as a "floor" level or the lowest level possible. The expert further testified that, at such a level, an individual might suffer from an alcohol black-out or memory loss.
An investigating officer testified that, two days after the offense, he presented the appellant with a warrant for arrest in the intensive care unit of the University of South Alabama hospital. He testified that the appellant's response was, "I didn't kill anybody." A firearm's expert testified that the appellant's gun must have been between five and eight feet from the victim's shirt when it was discharged. The expert further testified that the shotgun had a very light trigger pull or "hair trigger." The appellant testified that Deputy Dutton was his friend and that he does not remember shooting him.
The appellant presented the testimony of Dr. Rosen, a clinical psychologist, who was appointed by the court to examine the appellant. Dr. Rosen examined the appellant for approximately five hours on October 21, 1988, one hour on November 4, 1988, and one hour on February 3, 1989. Dr. Rosen testified that he had examined the records concerning the appellant's evaluation by three psychiatrists at the Taylor Hardin Mental Secure Medical Facility, as well as statements made by officers on the scene, and had viewed a videotape of the scene of the offense. Dr. Rosen testified that the appellant is illiterate with an overall intelligent quotient of 76, indicating that he is a "borderline intellectual functioning" individual. He testified that the appellant has a number of personality disorders, stating:
 "[H]e has what we call borderline personality features. A borderline personality is a very serious mental disorder. It is characterized by a lot of instability in life, many marriages, many relationships, constant problems keeping jobs. Those types of things. Plus a distinct tendency, particularly under stress, to become crazy, to go over the edge into what we technically call psychosis. This might be for a short period of time, maybe a few hours, maybe a day or so, then they come back in and the next time under stress, they tend to go back over the edge, over the border. That is why it is called borderline personality disorder.
 "In addition, he has the diagnosis of alcoholism. The specific diagnosis is alcohol abuse. He consistently, for many years, has drank a great deal of alcohol and this is affecting him.
 "He also has a borderline intellectual functioning. From the intelligence test and the fact that he went to the fifth grade, presumably, and doesn't know how to read or write and his life accomplishments are very low.
 ". . . He also has what we call adult antisocial traits which is another name for somebody who has gotten into some legal problems because of behavior.
 "So together, that is Mr. Hadley. A very dependent, very impulsive individual, markedly affected by alcohol and possibly having some organic brain damage as well."
Dr. Rosen further testified that, in his opinion, at the time of the alleged offense, the appellant was psychotic, intoxicated, and could not have appreciated the criminality of his conduct, nor could he conform his conduct to the requirements of law or form the intent to kill. Dr. Rosen further noted that he had a "strong suspicion" that the appellant had some organic brain damage and noted that the psychiatrist from Taylor Hardin had also found "some evidence" of this possibility. He noted that the organic brain damage could have been caused because the appellant had been involved in a number of car accidents and because of his long-time alcohol abuse.
A psychologist from Taylor Hardin testified that, in his opinion, the appellant was "not insane" at the time of the offense. However, the psychiatrists from Taylor Hardin differed substantially in their findings, and one of the psychiatrists found that the appellant was suffering from several *Page 151 
specific psychosis and alcohol abuse. The psychiatrist, who testified at trial, stated that, although the report quoted him as having stated that the appellant was of average intelligence, that he had was not so found. He further testified that the appellant was not suffering from depression during his treatment and, when confronted with records indicating that the appellant was being given a drug for depression during his treatment, stated that he had not prescribed the drug. The psychiatrist further testified that he did not think that it would necessarily be unusual for an individual to hit himself in the head with a pipe wrench.
At trial, the jury was instructed on the charged offense, as well as the lesser included offenses of manslaughter and intentional murder. The jury found the appellant guilty as charged in the indictment. Thereafter, at sentencing, the defense counsel informed the trial court that, contrary to his and his co-counsel's his wishes, the appellant wanted to be put to death upon conviction of the capital offense. A colloquy was then had between the trial court and the appellant, wherein the appellant affirmed that this was his wish, and that he understood his rights. The appellant was the only witness at the sentencing hearing, and the appellant asked the jury that they vote to recommend that he be put to death. The jury returned shortly with an advisory verdict of life imprisonment without parole, by a vote of 12 to 0.
At the subsequent sentencing hearing before the trial court, the defense counsel informed the court that the appellant, after meeting with his family, had changed his mind and did not want to be put to death. The appellant's son testified that he was not present when the appellant made his request to the jury. He testified that, upon learning of the statement, he contacted his father at jail and begged his father to think of his grandchildren and not to request death. The appellant took the stand and testified that, because of his family's request and his love for his family, he did not wish to die. The State presented the testimony of the officer who had written the presentence investigative report on the appellant's prior conviction of attempted arson. The witness testified that he was not the appellant's probation officer; however, he had been told by an officer who was involved in the prior conviction, that, as two officers approached the appellant's shack, they found the appellant doused in gasoline, with gasoline poured around the surrounding area of the shack, attempting to ignite a lighter. He further testified that he had been told that the appellant's mother was present in her home, which was located approximately 10 to 12 feet from the appellant's shack. The trial court, after weighing the aggravating and mitigating circumstances, sentenced the appellant to death by electrocution.
 I
The appellant argues that the Alabama capital offense statute making the murder of a police officer or other peace officer a capital offense, § 13A-5-40(a)(5), Code of Alabama 1975, is unconstitutional. Specifically, the appellant argues that the statute is unconstitutional because its provision that such a murder constitutes a capital offense "regardless of whether the defendant knew or should have known the victim was an officer or guard on duty" violates the appellant's rights to due process and equal protection, violates the Eighth Amendment, dispenses with the requirement of mens rea, and fails to provide the offender with notice.
The appellant argues that this "lack of a knowledge requirement" violates due process and equal protection, and that there is no rational basis for omitting a requirement of knowledge. The appellant cites Ex parte Murry, 455 So.2d 72
(Ala. 1984), in support of his argument. The portion of the holding in Ex parte Murry, supra, cited by the appellant is as follows:
 "The statute as applied by the trial court cannot have the effect of protecting police officers. If the defendant does not know the victim is a police officer, how is the escalation of the murder of a police officer to a capital offense supposed to deter him? *Page 152 
 "The state argues that the issue here is one of proof: the only time this issue is likely to arise is when an undercover, plain-clothes police officer is shot while on duty. In such situations, argues the state, the assailant is likely to be the only surviving witness, and will of course testify that he did not know the victim was a police officer. We cannot speculate that the legislature intended to create a unique strict liability capital offense on the basis of this reasoning, especially not in this case, where the surviving officer, Burks, contradicted Murry's testimony and said that both he and Officer McCord identified themselves as police."
Id. at 76.
However, the Alabama Supreme Court, in Ex parte Murry, supra, was analyzing the 1981 capital offense statute before the legislature passed "The Undercover Officer's Protection Act of 1987," which amended the statute by adding the abovecited pertinent language; dispensing with any doubt concerning the knowledge requirement. Thus, in Ex parte Murry, supra, the Alabama Supreme Court addressed the issue of whether the legislature intended the statute to require "that the accused know that the victim was a peace officer in order for the murder to be a capital offense" where the statute was still silent as to the existence of such a requirement. The statute, as amended, clearly still requires a culpable mental state, in that the intent to commit the murder is still an element of the offense.
This statute, as amended, is not unconstitutional, and its reasoning and purpose have been upheld by the United States Supreme Court in United States v. Feola, 420 U.S. 671,95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). In that case, the Court stated:
 "All the statute requires is an intent to assault, not an intent to assault a federal officer. A contrary conclusion would give insufficient protection to the agent enforcing an unpopular law, and none to the agent acting undercover.
 "This interpretation poses no risks of unfairness to defendants. It is no snare for the unsuspecting. Although the perpetrator of a narcotics 'rip-off' such as the one involved here, may be surprised to find that his intended victim is a federal officer in civilian apparel, he nonetheless knows from the very outset that his planned course of conduct is wrongful. The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected. In a case of this kind the offender takes his victim as he finds him."
Id. at 684-85, 95 S.Ct. at 1264.
Moreover, the statute does not violate the Eighth Amendment. The appellant relies on Enmund v. Florida, 458 U.S. 782,102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), in which the United States Supreme Court held that the death penalty could not be imposed for a felony murder where a defendant did not intend to murder his victim. Because the Alabama capital offense statute still requires that the murder of the law enforcement officer be intentional to constitute a capital offense, the statute is not inconsistent with violate the holding in Enmund v. Florida, supra.
The appellant also cites Roberts v. Louisiana, 431 U.S. 633,97 S.Ct. 1993, 52 L.Ed.2d 637 (1977), in support of his argument that the Alabama capital offense statute is unconstitutional. However, in Roberts v. Louisiana, supra, the Court held that a mandatory death sentence was unconstitutional for the murder of a police officer. In Alabama, the violation of this statute does not result in a mandatory death sentence, rather "[u]pon conviction of a defendant for a capital offense, the trial court [conducts] a separate sentence hearing to determine whether the defendant shall be sentenced to life imprisonment without parole or to death." Section 13A-5-45(a),Code of Alabama 1975.
Although the appellant argues that this statute violates the Eighth Amendment's ban on cruel and unusual punishment because the punishment is disproportionate to the crime, the United States Supreme Court has indicated that the death penalty is not cruel and unusual in all murder cases. Pulley v. Harris,465 U.S. 37, *Page 153 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Moreover, the Court has indicated that the death penalty is a constitutional punishment for intentional murder. Gregg v. Georgia, 428 U.S. 153,96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Enmund v. Florida, supra. The Alabama Supreme Court has held that the imposition of the death penalty for a violation of this statute does not constitute cruel and unusual punishment nor does it violate a defendant's equal protection of the law. Ex parte Harrell,470 So.2d 1309, 1317-18 (Ala. 1985).
 "This Court also finds no constitutional infirmity in § 13A-5-40(a)(5) simply because it makes the murder of an on-duty police officer a capital offense. As the Court of Criminal Appeals stated in Murry v. State, [455 So.2d 53
(Ala.Cr.App. 1983), reversed on other grounds, Ex parte Murry, supra];
 " 'Certainly, the legislature enacted this provision in contemplation of the societal gravity associated with the killing of law enforcement personnel, and to provide an enhanced deterrent against these killings and to give law enforcement officers a protection greater than the law of homicide provides to private citizens. United States v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).
 " 'Police officers risk their lives each day in the noble interest of protecting society and legislatures realize that these persons should be afforded protection commensurate with their responsibilities.'
 "We find § 13A-5-40(a)(5), as interpreted by this Court in Murry, to be a reasonable exercise of legislative authority which is neither arbitrary or capricious in imposing capital punishment upon one who intentionally and knowingly takes the life of a police officer, while that officer is engaged in carrying out his appointed duties, protecting the health, welfare, and property of citizens he serves. There is no absolutely no authority to support Harrell's claim that conviction under § 13A-5-40(a)(5) denied him equal protection of the law."
Id.
Finally, the appellant argues that this statute is also unconstitutional in that it does not give a putative offender prior notice of its applicability. Specifically, he argues "even assuming that one contemplates murder, if the putative offender does not know he is killing a police officer he cannot know that he is running afoul of the increased punishment mandated by the police-homicide statute." However, the appellant's argument is inconsistent with the rationale behindUnited States v. Feola, supra, in that "[t]he situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected. In a case of this kind the offender takes his victim as he finds him."420 U.S. at 684-85, 95 S.Ct. at 1264.
 II
The appellant argues that the trial court erred in failing to allow him to elicit an opinion concerning his sanity from a lay witness, Duckworth, who had known the appellant for 30 years and who had observed him, on the night in question, for a period of two and a half hours prior to the murder. Duckworth owned the pool hall, which the appellant had frequented for years and visited from approximately 6:30 or 7:30 p.m. until 9:00 p.m. on the night of the offense. During the cross-examination of this State's witness, the following occurred:
 "[Defense counsel]: Ms. Duckworth, you know or have some idea of what happened later that night or what the State is saying happened that night. That J.C. tragically shot and killed Howard Dutton?
"MS. DUCKWORTH: (Nods head affirmatively.)
 "[Defense counsel]: Didn't you tell me, from what you observed, that you thought something just snapped in J.C. that night?
 "[Prosecutor]: Object, Your Honor, I don't think this witness is capable — I *Page 154 
don't have any objections as on the same conditions as earlier. The same objection I made earlier on other matters.
"THE COURT: I sustain the objection."
However, the trial court's ruling was based, not on the excludability of the testimony, but rather on the order of proof. The prosecutor had previously stipulated as grounds of objection during the cross-examination of the appellant's sister-in-law that he should be allowed to "cross-examine" these witnesses as to matters which defense counsel were delving into on their cross-examination. The court had ruled that evidence concerning sanity and intoxication were defensive matters, which were more properly introduced during the appellant's presentation of his case. The trial court noted that by doing so, the witnesses would be subject to cross-examination by the State on the defensive matters of intoxication and insanity.
The trial court has broad discretion to control the order of proof. Webb v. State, 455 So.2d 223, 225 (Ala.Cr.App. 1984);Holm v. State, 416 So.2d 782, 788 (Ala.Cr.App. 1982). For cases in which the trial court properly prohibited the introduction of defensive matters during the States's case, see State v.Scober, 74 N.C. App. 469, 328 S.E.2d 590 (1985); Corvin v.Commonwealth, 131 Va. 649, 108 S.E. 651 (1921); State v.Edwards, 420 So.2d 663, 669 (La. 1982); State v. Stilwell,109 Or. 643, 221 P. 174 (1923).
Moreover, during the cross-examination of Duckworth, defense counsel was allowed to elicit testimony that the appellant's behavior was extremely strange on the night in question. The witness made such statements as, "He was different from any J.C. Hadley that I had ever known"; "He was on a high, you know, a high of some kind. It was strange, it was really strange."
We find no abuse by the trial court in sustaining the prosecutor's objection concerning the order of proof, nor do we find any resultant prejudice to the appellant by this ruling.
 III
The major issue of concern in the present case is the application of the sentence of death to this appellant under these facts. In Beck v. State, 396 So.2d 645, 664 (Ala. 1981), the Alabama Supreme Court held that, in order "[t]o insure that sentences of death will not be arbitrarily and capriciously imposed," the Court of Criminal Appeals as well as the Alabama Supreme Court should examine and review all death sentences to ascertain whether similar crimes throughout the state are being punished capitally; whether the crime was in fact one properly punishable by death; and whether the sentence of death is appropriate in relation to the particular defendant. Moreover, pursuant to § 13A-5-53(b)(2), Code of Alabama 1975, the Alabama Court of Criminal Appeals is directed, in determining whether death was the proper sentence in the case, to determine among other things, "[w]hether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence."
Pursuant to its duty to reweigh the aggravating and mitigating circumstances, this Court has previously remanded a case for resentencing where an improper aggravating circumstance was considered. Lewis v. State, 380 So.2d 970
(Ala.Cr.App. 1979). Thereafter, the United States Supreme Court held in Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418,77 L.Ed.2d 1134 (1983), that the consideration of an aggravating factor not authorized by state law where several authorized aggravating factors were also found could be found to constitute harmless error by the state court. In Wainwright v.Goode, 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983), the United States Supreme Court refused to vacate a death sentence where the Florida Supreme Court had held that the sentencer's improper consideration of an aggravating circumstance did not invalidate a death sentence. The United States Supreme Court noted that the Florida Supreme Court had independently reweighed the aggravating and mitigating circumstances, after excluding the improper aggravating *Page 155 
circumstance, and had determined that the death penalty was appropriate.
Following these decisions, the Alabama Court of Criminal Appeals has consistently held the consideration of such improper aggravating or mitigating circumstances to constitute harmless error. See Baldwin v. State, 456 So.2d 117
(Ala.Cr.App. 1983), affirmed, 456 So.2d 129 (Ala. 1984), affirmed, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985);Freeman v. State, 555 So.2d 196 (Ala.Cr.App. 1988), affirmed,555 So.2d 215 (Ala. 1989), cert. denied, ___ U.S. ___,110 S.Ct. 2604, 110 L.Ed.2d 284 (1990); Hinton v. State, 548 So.2d 547
(Ala.Cr.App. 1988), affirmed, 548 So.2d 562 (Ala. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989);Jackson v. State, 459 So.2d 963 (Ala.Cr.App.), affirmed,459 So.2d 969 (Ala. 1984), cert. denied, 470 U.S. 1034,105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); Thompson v. State, 503 So.2d 871
(Ala.Cr.App. 1986), affirmed, 503 So.2d 887 (Ala. 1987), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987);Thompson v. State, 542 So.2d 1286 (Ala.Cr.App. 1988), affirmed,542 So.2d 1300 (Ala. 1989), cert. denied, ___ U.S. ___,110 S.Ct. 208, 107 L.Ed.2d 161 (1989); and Wright v. State,494 So.2d 726 (Ala.Cr.App. 1985), affirmed, 494 So.2d 745
(Ala. 1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331,94 L.Ed.2d 183 (1987). See also Ex parte Williams, 556 So.2d 744
(Ala. 1987) (wherein the Alabama Supreme Court reversed the application of the harmless error rule to the jury's consideration of improper aggravating circumstance, which was held harmless because the trial court did not consider the circumstance; the Alabama Supreme Court "emphasized" that the reversal was based on independent state law grounds and upon statutory construction as to the application of the harmless error rule).
 "We find that Barclay [v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983)] and Goode, when read together, make clear that a state appellate court may constitutionally independently re-weigh aggravating and mitigating circumstances to determine whether a death sentence must be vacated as arbitrary and capricious, in light of a finding on appeal that a particular aggravating circumstance, which was considered by the sentencer, was not supported by sufficient record evidence. We believe that this independent reweighing under such circumstances provides a rational safeguard for the constitutional requirement 'that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion.' California v. Brown, 479 U.S. 538, 540, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987). We further find that the foregoing analysis supports the constitutionality of this Court's recent decision in Stouffer v. State, 742 P.2d 562
(Okla.Crim.App. 1987) (Opinion on Rehearing), holding that an independent reweighing of aggravating and mitigating circumstances is implicitly necessary to a determination that a death sentence be factually substantiated and valid pursuant to this Court's duty to conduct a mandatory capital sentencing review under 21 O.S. 1981, § 701.13[21-701.13](F). As the plurality stated in Barclay, '[t]here is no reason why the [state court] cannot examine the balance struck by the [sentencer] and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance.' Barclay, 463 U.S. at 958, 103 S.Ct. at 3429."
Castro v. State, 749 P.2d 1146, 1148 (Okla.Cr.App. 1987), cert. denied, 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988).
In the present case, the trial court found the existence of two aggravating circumstances: that "[t]he capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws," §13A-5-49(7), Code of Alabama 1975; and that "[t]he defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person," §13A-5-49(2), Code of Alabama 1975. The trial court found the existence of one mitigating circumstance, that "[t]he capital offense was committed while the defendant was under the influence of extreme mental or emotional *Page 156 
disturbance." Section 13A-5-51(2), Code of Alabama 1975. The trial court further found that the capacity of the appellant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired by alcohol, mental retardation, or otherwise. The trial court made no specific written findings concerning the appellant's requested non-statutory mitigating circumstances. See Ex parte Cochran, 500 So.2d 1179 (Ala. 1985) (wherein the cause was remanded to the trial court for clarification of its sentencing order where the trial court failed to make specific findings concerning non-statutory mitigating circumstances).
The trial court's finding of the aggravating circumstance that the appellant had been previously convicted of a felony involving the use or threat of violence to the person was based on the appellant's prior conviction for attempted arson. This type of offense was not properly intended to be encompassed by this aggravating circumstance. There was no indication that the appellant's actions constituted a threat of violence to investigating officers who arrived and arrested the appellant, nor did the appellant's actions constitute a threat of violence to his mother, who was possibly at her home situated approximately 12 feet from the appellant's shack.
The term "threat" is very broad and indefinite. Generally, a threat in criminal law is a menace or declaration of one's purpose or intention toward injury to the person, property, or rights of another, by commission of an unlawful act. SeeSchott v. People, 174 Colo. 15, 482 P.2d 101 (1971); People v.Hines, 780 P.2d 556 (1989); State v. Cushing, 17 Wn. 544,50 P. 512 (1897). A threat can include almost any kind of an expression of intent by one person to do an act against another person, ordinarily indicating an intention to do harm. State v.Moyer, 87 W. Va. 137, 104 S.E. 407 (1920). Moreover, a threat generally includes any menace that would serve to unsettle the mind of the person on whom it operates and to take away from his acts the free and voluntary action which constitutes consent. State v. Hamre, 247 Or. 359, 429 P.2d 804 (1967). See also 41A, Words and Phrases, "Threat" (1965).
Because the appellant's prior conviction was for attempted arson, an inchoate crime, it would have to fall under the category of prior felonies involving threat of violence to the person. As indicated by definition, a threat is made by one person and directed to another. This aggravating circumstance was intended to single out those individuals who pose a present danger to the public because they have threatened felonious violence in the past. An attempted suicide, which includes no other intended or threatened victim, is not such an offense.
Historically, offenses which have been found to uphold this aggravating circumstance include: armed robbery, State v.Hamlette, 302 N.C. 490, 276 S.E.2d 338 (1981); kidnapping and attempted first degree murder, Fitzpatrick v. State,437 So.2d 1072 (Fla. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1328,79 L.Ed.2d 723 (1984); discharging a firearm into occupied property, State v. Brown, 320 N.C. 179, 358 S.E.2d 1
(N.C. 1987), cert. denied, 484 U.S. 970, 108 S.Ct. 467,98 L.Ed.2d 406 (1987); and robbery and aggravated robbery, Gardnerv. State, 297 Ark. 541, 764 S.W.2d 416 (1989).[3] In Alabama, offenses which have been held to uphold this aggravating circumstance include: robbery, Brownlee v. State, 545 So.2d 151
(Ala.Cr.App. 1988), affirmed, 545 So.2d 166 (Ala. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); capital murder, Jones v. State, 450 So.2d 165
(Ala.Cr.App. 1983), affirmed, 450 So.2d 171 (Ala. 1984), cert. denied, 469 U.S. 873, 105 S.Ct. 232, 83 L.Ed.2d 160 (1984); manslaughter, Siebert v. State, 562 So.2d 586
(Ala.Cr.App. 1989), affirmed, 562 So.2d 600 (Ala. 1990); murder,Jackson v. State, 459 So.2d 963 (Ala.Cr.App.), affirmed,459 So.2d 969 (Ala. 1984), cert. denied, 470 U.S. 1034, *Page 157 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); murder and criminal assault,Coulter v. State, 438 So.2d 336 (Ala.Cr.App. 1982), affirmed,438 So.2d 352 (Ala. 1983); and robbery, Ex parte Thomas,460 So.2d 216 (Ala. 1984).
Although the prosecutor pointed out at trial that the appellant's mother was apparently present in a house nearby, it is the "threat of violence and not the potential for violence that brings an offense into this category of aggravating circumstances." Commonwealth v. Christy, 511 Pa. 490,515 A.2d 832, 841 (Pa. 1986), cert. denied, 481 U.S. 1059,107 S.Ct. 2202, 95 L.Ed.2d 857 (1987). Similarly, the arrival of the two investigating officers, after they were called to the scene, does not justify this prior conviction to be considered as an aggravating circumstance. In Commonwealth v. Christy, 511 Pa. 490, 515 A.2d 832 (1986), the State submitted the defendant's prior convictions of escape and burglary in order to warrant the aggravating factor that the defendant had a significant history of felony convictions involving threat or use of violence to the person. The Pennsylvania Supreme Court wrote:
 "At the sentencing hearing, the Commonwealth argued that the inquiry here is whether 'someone could have been seriously injured,' equating the 'threat of violence' with the 'potential for violence.' The trial court erroneously agreed with this argument. In our view, the language of 42 Pa. C.S. § 9711(d)(9) is clear as to this point. It is the 'threat of' and not the 'potential for' violence that brings a crime into this category.
 "Force is not an element of either of these crimes. Indeed, both crimes can be committed without even encountering another person. Every felony has the potential for violence if the actor is caught. This, however, is not what the legislature intended by the words 'threat of violence' to the person. In order for a felony to be includable under 42 Pa. C.S. § 9711(d)(9), the Commonwealth must present evidence that the defendant actually threatened another with violence or actually used violence on another."
Commonwealth v. Christy, supra, 515 A.2d at 840-41.
"Also, the felony for which the convicted must be one involving threat or use of violence to the person. It cannot, under this provision, be a crime against property." State v.Goodman, 298 N.C. 1, 16, 257 S.E.2d 569, 584 (1979).
Thus, the appellant's prior conviction for attempted arson was improperly considered as an aggravating circumstance.
We further find that the trial court erred in failing to find the existence of the mitigating circumstance stated in §13A-5-51(6), Code of Alabama 1975, that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." The trial court specifically stated in his findings that the "capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired by alcohol, mental retardation, or otherwise." The evidence at trial was uncontroverted that, upon arrival at the hospital, the appellant's blood-alcohol content measured .173%, and that this test was made after the appellant's blood had been diluted with intravenous fluids and approximately an hour and a half to two hours after he could have possibly consumed any alcohol. The evidence was also apparently uncontradicted that the appellant was of very low intelligence.[4] The evidence was further uncontradicted that the appellant suffered from long-time alcohol abuse, and both the defense's expert as well as one of the State's experts, indicated that the appellant suffered from a number of specific psychoses. Moreover, the expert for the defense indicated that he had a strong suspicion that the appellant suffered from some organic brain damage; the report from Taylor Hardin also indicated such a possibility. The record is full of testimony concerning *Page 158 
the appellant's bizarre behavior on the day of the offense. As the trial court's finding that the aggravating circumstance did not exist was a finding of fact, rather than a legal determination concerning the finding of sanity, see Magwood v.Smith, 791 F.2d 1438, 1447 (11th Cir. 1986), affirmed, Ex parteMagwood, 548 So.2d 516 (Ala. 1988), cert. denied, ___ U.S. ___,110 S.Ct. 291, 107 L.Ed.2d 271 (1989), we find that the trial court erred in failing to find the existence of this mitigating circumstance. In Magwood v. Smith, supra, the Eleventh Circuit Court of Appeals determined that the Alabama state courts erred in failing to find the existence of two mitigating circumstances: that the felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; and that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.[5]
In so holding, the Eleventh Circuit of Appeals upheld the district court's determination that the rejection of these two "mental condition" mitigating factors was not fairly supported by the record. The Court held:
 "After conducting a thorough review of the expert psychiatric testimony, Magwood v. Smith, 608 F. Supp. [218] at 226-27, [(D.C.Ala. 1985)] the court concluded that 'the evidence of the existence of the mitigating factors relating to Magwood's mental state is so overwhelming as to make the trial court's rejection of their existence clearly erroneous.' Id. at 226.
". . . .
 "If courts can find on the evidence in this case that Magwood was not so mentally impaired, then the requirements of Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); and Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929
(1976), which upheld the imposition of the death sentence where there were standards and the sentence of death was not arbitrarily or capriciously imposed become only parts of a litany without practical meaning. To find that mitigating circumstances do not exist where such mitigating circumstances clearly exist returns us to the state of affairs which were found by the Supreme Court in Furman v. Georgia to be prohibited by the Constitution.
"Magwood v. Smith, 608 F. Supp. at 228."
Id. at 1448. Based on the present record, this mitigating circumstance should have been considered in the weighing process, and the trial court's rejection of the existence of this mitigating circumstance was erroneous.
"[T]hirty out of 37 jurisdictions with a capital sentencing statute give the life-or-death decision to the jury, with only 3 of the remaining 7 allowing a judge to override a jury's recommendation of life." Spaziano v. Florida, 468 U.S. 447,463, 104 S.Ct. 3154, 3164, 82 L.Ed.2d 340 (1984). "Besides Florida, the only States that allow a judge to override a jury's recommendation are Alabama and Indiana." Id. at 464, n. 9, 104 S.Ct. at 3164, n. 9. The Florida courts have adopted what has come to be known as the "Tedder" rule, Tedder v.State, 322 So.2d 908, 910 (Fla. 1975), wherein the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ in order to sustain a trial court's sentence of death following a jury recommendation of life. Alabama has specifically rejected the Tedder rule. Ex parte Jones, 456 So.2d 380 (Ala. 1984). In 1989, the Supreme Court of Indiana adopted the Tedder rule:
 "In Alabama, the only other state which allows a trial court to override the jury's recommendation against death, the Alabama Supreme Court has yet to formulate a distinct standard. In such cases, the Alabama Supreme Court independently weighs the aggravating and mitigating *Page 159 
circumstances to determine whether the death penalty was appropriate. E.g. Ex parte Hays, 518 So.2d 768 (Ala. 1986), cert. denied, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1989)."
Martinez Chavez v. State, 534 N.E.2d 731, 734 n. 2 (Ind. 1989).
In the present case, the trial court overrode a jury's recommendation of life without parole, wherein all 12 jurors so voted. The trial court improperly found the existence of one aggravating circumstance and improperly did not find the existence of one mitigating circumstance. The trial court, in sentencing the appellant, weighed the existence of two aggravating circumstances against one mitigating circumstance and determined that the appellant should be sentenced to death. The process of weighing aggravating and mitigating circumstances is not a mere tallying for numerical comparison. § 13A-5-48, Code of Alabama 1975. However, pursuant to this Court's duty to reweigh the aggravating and mitigating circumstances, we find that the appellant was improperly sentenced to death.
Although a trial court is statutorily empowered to override a jury's advisory verdict, § 13A-5-47(e), Code of Alabama 1975, this court may determine that such an override is improper where, after reweighing the aggravating and mitigating circumstances and based on the evidence presented, the principles and standards of "fundamental fairness" require that the trial court's action be reversed. The Florida Supreme Court faced the issue of whether, in a particular case, the death penalty was appropriate under the facts. Fitzpatrick v. State,527 So.2d 809 (Fla. 1988). In that case, the defendant formulated a plan, in which he determined to take hostages from a real estate office, located close to a bank. He planned to take the hostages to the bank and, using them as a shield, rob the bank. The defendant then planned to escape into the crowd and take a bus home. However, after the defendant entered the real estate office, with a gun taped into his hand, he ended up trapped in an office located in the real estate building, with three hostages. The defendant locked himself and the three hostages in the office "to await the arrival of the police."Id. at 810. He stated that he would have to kill the hostages, police, and himself. When a deputy surprised the defendant by pointing his gun at the defendant through a partition, the defendant shot and killed the deputy. Thereafter, following a resentencing proceeding, a jury recommended "against life imprisonment" and the trial judge again sentenced the defendant to death. Id. at 811. The Florida Supreme Court reweighed the aggravating and mitigating circumstances.[6] The Court then concluded that this case did not warrant the imposition of the death penalty and determined that the defendant's sentence of death should be vacated and reduced to "life imprisonment without the possibility of parole for 25 years." The Florida Supreme Court concluded that the mitigation in the case was substantial and concluded that "Fitzpatrick's actions were those of a seriously emotionally disturbed man-child, not those of a cold-blooded, heartless killer." Id. at 812.
 "Any review of the proportionality of the death penalty in a particular case must begin with the premise that death is different. In State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied sub nom., 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), this Court upheld Florida's amended capital punishment statute, stating that: *Page 160 
" 'Death is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation. It is proper, therefore, that the legislature has chosen to reserve its application to only the most aggravated and unmitigated of most serious crimes.'
 "Id. at 7 (emphasis added). As we further stated in Dixon, the legislature intended the death penalty to be imposed 'for the most aggravated, the most indefensible of crimes.' Id. at 8. in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Justice Stewart began his concurring opinion with an instructive admonition:
 "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.
 "408 U.S. at 306, 92 S.Ct. at 2760 (Stewart, J., concurring) (quoted in Hamblen v. State, 527 So.2d 800 (Fla. 1988) (Barkett, J., dissenting))."
Id. at 811. (Emphasis in original.)
In the present case, after reweighing the aggravating and mitigating circumstances, there remains one aggravating circumstance offset by two mitigating circumstances.
Therefore, this cause is due to be remanded to the trial court with instructions to reweigh the aggravating and mitigating circumstances, before re-evaluating the appellant's sentence. The trial court should resentence the defendant and, thereafter, submit a written order including his findings and conclusions to this court, within a time period not to exceed 90 days.
AFFIRMED AS TO CONVICTION; SENTENCE OF DEATH VACATED; REMANDED FOR RESENTENCING.
All the Judges concur.
[1] The appellant testified that he stated that he responded to the deputy sheriffs question by indicating that the shells were for somebody and maybe for himself. He indicated that he did not know why he answered the question that way.
[2] Section 13A-5-40(a)(5), Code of Alabama 1975, was amended in 1987 so that the statute eliminates the requirement of knowledge of the officer's status by the offender.
[3] The applicable statutory language in defining this aggravating circumstance in Arkansas specifically designates "use of threat of violence to another person or creating a substantial risk of death or serious physical injury to another person."
[4] Despite the fact that the record from Taylor Hardin indicates that Dr. Nagi determined that the appellant was of average intelligence, he testified at trial that this was not his finding and someone else had erroneously quoted him as having made that determination.
[5] The offense in Magwood v. Smith, supra, occurred in 1979 and therefore the applicable mitigating circumstances were defined under § 13-11-7, Code of Alabama 1975. That section has been transferred to § 13A-5-51, Code of Alabama 1975.
[6] The trial court found the existence of five aggravating circumstances: the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence; the defendant knowing created a great risk of death to many persons; the capital felony was committed while the defendant was engaged in the commission of, or attempted commission of an enumerated felony, namely kidnapping; the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; and the capital was committed for pecuniary gain. The trial court also found the existence of three mitigating circumstances; the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; the capacity of the defendant to appreciate the criminality of his conduct to the requirements of law were substantially impaired; and the age of the defendant at the time of the crime.