KELLUM, Judge.
 
 [1]
 

 The appellant, Kenneth Eugene Billups, was convicted of 13 counts of capital mur
 
 *125
 
 der in connection with the killings of Wilbur Gomez, Enrique Marquez, Rafael Sal-cedo, and Manuel Nunez Perez. Counts I-IV charged him with murder made capital because it was committed during a first-degree robbery as to Gomez, Marquez, Salcedo, and Perez, respectively, see § 13A-5-40(a)(2), Ala.Code 1975. Counts V-VIII charged him with murder made capital because it was committed during a first-degree kidnapping as to Gomez, Marquez, Salcedo, and Perez, see § 13A-5-40(a)(1), Ala.Code 1975. Counts IX-XII charged him with murder made capital because it was committed during a first- or second-degree burglary as to Gomez, Marquez, Salcedo, and Perez, respectively, see § 13A-5-40(a)(4), Ala.Code 1975. Finally, Count XIII charged him with murder made capital because he killed Gomez, Marquez, Salcedo, and Perez by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975. The jury unanimously recommended that Billups be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Bill-ups to death. This appeal followed.
 

 The State’s evidence tended to show the following: On December 16, 2003, Osman Valladres telephoned Pablo Stuart, a friend of his, and asked Stuart for a ride to Billups’s house in Center Point. Valladres told Stuart that he had to go to Billups’s house to collect a debt; instead, Valladres intended to purchase marijuana once they were at Billups’s house. Valladres had previously purchased marijuana from Bill-ups.
 

 Stuart picked up Valladres at 3:00 p.m. and drove him to Billups’s house. When they arrived, Billups was waiting at the front door and directed Stuart to park his car in front of the garage. Stuart wanted to stay outside and wait in the car while Valladres went inside, but Billups persuaded him to come inside the house. Once in the house, Stuart and Valladres were escorted into the kitchen, where they sat at a table facing the wall. Stuart and Valla-dres saw marijuana and a stack of cash on the kitchen table. Billups and Charles Cooper, who were also seated at the table, began to smoke marijuana. Stuart was offered marijuana, but he declined. A few moments later, Billups’s girlfriend, Catrina Robina, emerged from another part of the house and entered the kitchen from behind Stuart and Valladres. Robina stated that she had “a headache,” while signaling for Cooper to put a gun to Stuart’s head. (R. 704.) Cooper pointed a gun at Stuart’s head and asked him if he had any marijuana. Quinton Parrish, who was also in the house, rushed into the room brandishing a gun equipped with a laser-scope. Billups, who was described by both Stuart and Valladres as the “boss” or leader of the group, then pulled out his gun.
 

 After forcing Stuart and Valladres to the floor at gunpoint, Billups and his associates searched Stuart and Valladres for guns. Finding none, Billups and his associates bound Stuart and Valladres with duct tape. Parrish stripped Stuart of his wallet, a necklace, a bracelet, and a ring. Finding no drugs on Stuart or Valladres, Billups instructed Valladres to telephone someone who could get them some marijuana and cocaine. Valladres telephoned a drug dealer while they were at Billups’s house.
 

 Stuart and Valladres were taken to the basement garage of Billups’s house where Parrish had moved Stuart’s car. Still bound with duct tape, Stuart and Valladres were forced at gunpoint’ into Stuart’s car and driven to Valladres’s apartment. Cooper, accompanied by Billups, drove Stuart and Valladres to the apartment. Parrish followed behind them in another car.
 

 
 *126
 
 Once the group was at the apartment, the duct tape was removed from Stuart and Valladres. Billups then ordered Valla-dres to telephone some “Mexicans” and ask them to get some drugs; Valladres complied with Billups’s order. Approximately one to two hours later, two Hispanic men — Salcedo and Marquez — arrived at the apartment. Billups showed the two men a bag containing some money, telling them it was $70,000. Billups asked the men if they could get 45 pounds of marijuana and 2 kilos of cocaine. Salcedo and Marquez told Billups that they could get only 35 pounds of marijuana. Billups agreed to the exchange, and the men left the apartment. After the men left, Billups ordered pizza to be delivered. Meanwhile, Parrish took some jewelry, clothing, and hair clippers he had found in Valladres’s bedroom.
 

 After waiting several hours and growing impatient, Billups ordered Valladres to telephone “the Mexicans” — i.e., Salcedo and Marquez — to see where they were; Valladres telephoned at least two times. At approximately 11:00 p.m., Salcedo and Marquez returned to the apartment carrying a plastic container full of marijuana, which they placed on the kitchen floor. A third Hispanic man walked into the apartment, prompting Billups to ask if anyone else had accompanied them. When they answered in the affirmative, Billups ordered Stuart to go and call the fourth Hispanic man inside. Once Salcedo, Marquez, and the two other Hispanic men— subsequently identified as Gomez and Perez — were in the apartment, Billups searched all four for weapons. Meanwhile, Stuart and Valladres positioned themselves near the kitchen and living-room doors, respectively.
 

 After Billups inspected the marijuana, gunfire erupted. Billups and Parrish began firing their guns at the four unarmed Hispanic men. The four men pleaded for their lives. Valladres testified that some of the men were shot in the back as they stood up to flee. Billups knelt on the back of one of the victims who was already on the floor and shot him in the back of the head several times. Salcedo, Marquez, Gomez, and Perez were killed. Autopsies performed on the victims’ bodies indicated that all the victims sustained fatal gunshot wounds to the head.
 

 Stuart and Valladres escaped the apartment during the shooting. Stuart ran and hid in the woods while Valladres fled to a friend’s apartment. Billups, Cooper, and Parrish emerged from the apartment, carrying the 35 pounds of marijuana. The three men got into the ear driven by Parrish and drove away.
 

 Following the shooting, Cooper’s wife, Tangela, saw Billups with her husband. Tangela testified that Billups had a substantial amount of blood on his shoes. According to Tangela, Billups boasted, “I killed those motherfuckers.” (R. 1634.) Robert Walker, Billups’s cousin, saw Bill-ups shortly after the murders and heard Billups brag: “That shit was like ‘New Jack City.’ ”
 
 [2]
 
 (R. 1674.) Walker believed Billups meant that the killings were done in a ruthless and cold-hearted manner. In January 2004, Billups was apprehended by United States marshals in Cedar Rapids, Iowa, and returned to Jefferson County to stand trial.
 

 The jury found Billups guilty of the capital offenses charged in the indictment. Following the penalty phase of Billups’s trial, see § 13A-5-46, Ala.Code 1975, the
 
 *127
 
 jury unanimously recommended that Bill-ups be sentenced to death. A presentence report was then prepared as required by § 13A-5-47, Ala.Code 1975, and the circuit court held a separate sentencing hearing. After hearing testimony, the circuit court sentenced Billups to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala.Code 1975.
 

 Standard of Review
 

 Because Billups has been sentenced to death, this Court must review the record for any “plain error.” Rule 45A, Ala. R.App. P., provides:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 As we stated in
 
 Hall v. State,
 
 820 So.2d 113 (Ala.Crim.App.1999):
 

 “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affeetfs] the fairness, integrity or public reputation of judicial proceedings.’ See
 
 Ex parte Price,
 
 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
 

 820 So.2d at 121-22.
 

 With these principles in mind, we review the issues raised by Billups on appeal.
 

 Guilt-Phase Issues
 

 I.
 

 Billups contends that the indictment in the instant case charging him with 13 counts of capital murder was multiplicitous in that the charges in the indictment were “excessive, prejudicial and prolix” and violated the principles of double jeopardy. (Billups’s brief, at 5-6.)
 

 The indictment against Billups contained 13 counts and alleged that Billups caused the death of four victims: Gomez, Marquez, Salcedo, and Perez. The indictment included four counts — one for each victim — of each of the following: intentional murder during the commission of first-degree robbery, § 13A-5-40(a)(2), Ala. Code 1975; intentional murder during the commission of first- or second-degree burglary, § 13A-5-40(a)(4), Ala.Code 1975; and intentional murder during the commission of first-degree kidnapping, § 13A-5-40(a)(1), Ala.Code 1975. In addition to those 12 counts, the indictment charged Billups with murder made capital because he killed the four victims by one act or pursuant to one scheme or course of conduct, § 13A-5^0(a)(10), Ala.Code 1975.
 

 “An indictment is multiplicitous if a single offense is charged in more than one count, thereby possibly prejudicing the defendant by suggesting that more than one offense had been committed.”
 
 Dill v. State,
 
 723 So.2d 787, 808 (Ala.Crim.App.1998). In the instant case, the indictment
 
 *128
 
 charged Billups with three separate offenses as to each of the four victims and an additional offense for the murder of two or more people by one act or pursuant to one scheme or course of conduct. Each count in the indictment represented a separate offense under §§ 13A-5-40(a)(l), (2), (4), and (10), Ala.Code 1975, as to a separate victim. Therefore, the indictment was not multiplicitous.
 

 Regarding Billups’s double-jeopardy claim, this Court has repeatedly held that multiple capital-murder convictions can be based on the death of one victim. Our Supreme Court addressed the merits of a claim similar to Billups’s claim in
 
 Ex parte Peraita,
 
 897 So.2d 1227 (Ala.2004). In
 
 Peraita,
 
 supra, the defendant was indicted for two counts of capital murder for the death of one individual. The defendant argued that his indictment for two counts of capital murder violated his right not to be subjected to double jeopardy.
 
 Peraita,
 
 897 So.2d at 1236. Rejecting the defendant’s argument in
 
 Peraita,
 
 our Supreme Court stated:
 

 “Peraita argues that both state and federal law prohibit a state from subjecting a defendant to double jeopardy, and that the indictment charging him sought to exact ‘multiple prosecutions’ for the same offense.
 
 Blockburger v. United States,
 
 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).
 

 “The
 
 Blockburger
 
 test is aimed at, among other things, “‘multiple punishments imposed in a single prosecution.” ’
 
 Grady v. Corbin,
 
 495 U.S. 508, 516-17, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) (quoting
 
 Garrett v. United States,
 
 471 U.S. 773, 778, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985)). Peraita argues that conviction of two counts of capital murder for the killing of a single person constitutes such multiple punishment. He cites
 
 Meyer v. State,
 
 575 So.2d 1212 (Ala.Crim.App.1990), and
 
 Ex parte Rice,
 
 766 So.2d 143 (Ala.1999), for the proposition that multiple charges from the same statute violate double-jeopardy principles.
 

 “The defendant in
 
 Meyer
 
 was charged with capital murder and indicted for three counts of capital murder for the killing of one person. His indictment alleged that he committed the murder while committing robbery of three separate items. The Court of Criminal Appeals held that these three allegations were merely three ‘ “alternative methods of proving the same crime, and therefore, did not constitute separate offenses.” ’
 
 Meyer,
 
 575 So.2d at 1217 (quoting
 
 Sisson v. State,
 
 528 So.2d 1159, 1162 (Ala.1988)).
 

 “In
 
 Rice,
 
 the defendant was charged with two counts of capital murder for the killing of one individual during a robbery and a kidnapping; he was convicted of two counts of ‘the crime of murder’ under Ala.Code 1975, § 13A-6-2(a)(3), specifically the lesser-included offense of felony murder. This Court held that, much like
 
 Meyer
 
 and
 
 Sisson,
 
 each count in
 
 Rice
 
 was an alternative method of proving but a single crime.
 

 “In contrast to
 
 Meyer
 
 and
 
 Rice,
 
 the two capital-murder charges against Per-aita are separate offenses. Each count of capital murder is a separate offense, as shown by the beginning of the statute defining capital offenses, which provides, ‘The following are capital offenses.’ Ala. Code 1975, § 13A-5-40(a). So long as each count of the crime concerns a separate offense, as opposed to a separate method of proving that offense, the double-jeopardy provision of the United States Constitution is not implicated. We hold that Peraita’s right to be free from double jeopardy was not violated by his having been tried and convicted
 
 *129
 
 of two counts of capital murder for the killing of one individual.”
 

 Peraita,
 
 897 So.2d at 1236. See also
 
 Powell v. State,
 
 796 So.2d 404, 423-24 (Ala.Crim.App.1999) (holding that indictment charging defendant with the separate capital offenses of murder during the course of a burglary in the first degree, murder during the course of a robbery in the first degree, murder during a rape in the first degree, and murder during sodomy in the first degree for the murder of one victim did not violate the Double Jeopardy Clause).
 

 In the present case, Billups was charged with 13 counts of capital murder for the murders of 4 individuals. In separate counts of the indictment, Billups was charged with four counts of murder made capital because it was committed during the course of a first-degree robbery; four counts of murder made capital because it was committed during the course of a first- or second-degree burglary; and four counts of murder made capital because it was committed during the course of a first-degree kidnapping. The final count in the indictment charged Billups with the murder of two or more people pursuant to one act or course of conduct. In keeping with
 
 Peraita,
 
 supra, and
 
 Powell,
 
 supra, Billups was indicted for multiple counts of capital murder for each of the four victims in the instant case. Therefore, the charges in the indictment were not multiplicitous, and Billups’s conviction for 13 counts of capital murder did not violate double-jeopardy principles.
 

 II.
 

 Billups next contends that the circuit court abused its discretion in denying his pretrial request for funds to hire mitigation experts to assist him in the penalty phase of the capital-murder trial.
 

 In
 
 Ex parte Moody,
 
 684 So.2d 114 (Ala.1996), the Alabama Supreme Court defined the standard by which a trial court must assess an indigent defendant’s request for expert assistance:
 

 “Although the [United States] Supreme Court has not specifically stated what ‘threshold showing’ must be made by the indigent defendant with regard to the need for an expert, the Court refused to require the state to pay for certain experts when the indigent defendant ‘offered little more than undeveloped assertions that the requested assistance would be beneficial.’
 
 Caldwell v. Mississippi
 
 472 U.S. 320 at 323, 105 S.Ct. 2633 at 2637, 86 L.Ed.2d 231 (1985). As we stated in
 
 Dubose [v. State,
 
 662 So.2d 1189 (Ala.1995),] the Supreme Court cases of
 
 Ake [v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985),] and
 
 Caldwell,
 
 "viewed together, seem to hold that an indigent defendant must show more than a mere possibility that an expert would aid in his defense. ‘Rather, the defendant must show a reasonable probability that an expert would aid in his defense and [must show that] a denial of an expert to assist at trial would result in a fundamentally unfair trial.’
 
 Dubose,
 
 662 So.2d at 1192, citing
 
 Moore v. Kemp,
 
 809 F.2d 702 (11th Cir.), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).
 

 [[Image here]]
 

 “Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary
 
 *130
 
 to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense.”
 

 Moody,
 
 684 So.2d at 119.
 

 The record reflects that Billups filed a motion for funds to hire a mitigation expert. He stated as grounds for his motion that he had been charged with capital murder; that the case was very factually complicated; that the prosecution had not indicated that it would offer Billups a plea deal; that an expert was necessary to ensure that Billups received a fair trial; and that it was imperative for the court to grant the motion, based on the prosecution’s decision to seek the death penalty. At the hearing on the motion, defense counsel argued before the circuit court as follows:
 

 “THE COURT: On what issue would the psychologist be beneficial to the defendant? Is there any issue of retardation or mental illness or anything of that nature in this case?
 

 “[DEFENSE COUNSEL]: There is none apparent, Judge. But the State has made it extremely clear at least to this point and after the reading of a thirteen-count indictment, each count of which has its own aggravating circumstance — and I have discussed this matter with the State and there have been no offers of settlement in this matter — it certainly appears clear that the State is seeking the death penalty in this case and intends to go forward with it.
 

 “I would think that the defendant would be entitled to — or defense, I should say, should be entitled to — know whether or not the defendant does have difficulties in that manner. But I think that would speak more to the expense for the private psychologist as opposed to the mitigation expert. That is why I wanted the Court to know that if we had a choice, I would prefer to have the—
 

 “THE COURT: I guess the question is really if there is a need for either. I have tried many cases of this nature in the past where mitigation was presented without an expert. I guess my question is why is there a need for an expert to do that in this case?
 

 “[DEFENSE COUNSEL]: Because, Judge, just to be blunt with the Court, I think the likelihood of the death penalty in this case is extremely high. I think most capital cases that come through here on a routine basis, while they may be death-qualified under the statute, I don’t know that they are as likely as the death penalty would be in this case.
 

 “As I said earlier, we have a thirteen-count indictment, each count of which carries its own aggravating circumstance. There may be other aggravating circumstances. And I will tell the Court, in my opinion, that there is.
 

 “But each count of the thirteen-count indictment carries its own aggravating factor. And that is why I think that the defense would be entitled to a mitigation expert.”
 

 (R. 29-30.)
 

 In the instant case, Billups failed to show that his trial would be fundamentally unfair because the circuit court did not approve funds for a mitigation expert. Billups merely speculated regarding his need for an expert and based his request primarily on the fact that he was being tried for capital murder. See
 
 Lee v. State,
 
 898 So.2d 790, 853 (Ala.Crim.App.2001) (mere speculation that an expert would assist in the defense does not satisfy threshold showing that the denial of funds to hire an expert would result in fundamentally unfair trial); see also
 
 Hodges v. State,
 
 856 So.2d 875, 915 (Ala.Crim.App.
 
 *131
 
 2001) (holding that general request for funds on basis that all capital defendants should be. given funds for investigator does not satisfy defendant’s burden). Therefore, the circuit court did not abuse its discretion in denying Billups’s request for funds to hire a mitigation expert.
 

 III.
 

 Billups also contends that the circuit court erred by admitting into evidence audio recordings of telephone conversations he had while he was incarcerated awaiting trial. Billups argues that the recordings were obtained illegally and without his permission, that they violated his right to privacy, and that they constituted illegal eavesdropping. The record indicates that the State introduced audio recordings of conversations between Billups and his mother in October 2005 and November 2005 in which Billups attempts to speak with witnesses and to fabricate an alibi for trial. The audio recordings were admitted over Billups’s objection.
 

 “The admission or exclusion of evidence is a matter within the sound discretion of the trial court.”
 
 Taylor v. State,
 
 808 So.2d 1148, 1191 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001). “The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.”
 
 Ex parte Loggins,
 
 771 So.2d 1093, 1103 (Ala.2000).
 

 In Alabama, a prisoner has no reasonable expectation of privacy in the telephone conversations engaged in by the prisoner at a penal institution.
 
 Teat v. State,
 
 636 So.2d 697 (Ala.Crim.App.1993). As this Court noted in
 
 Teat:
 

 “As the United States Supreme Court stated in
 
 Bell v. Wolfish,
 
 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979):
 

 “ ‘ “Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.”
 
 Price v. Johnston,
 
 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948) ... The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights ... A detainee simply does not possess the full range of freedoms of an unincarcerated individual.’
 

 “441 U.S. at 546, 99 S.Ct. at 1877-78.”
 

 636 So.2d at 698-99.
 

 Testimony at trial established that inmates in the county jail where Billups was housed before trial were warned that telephone calls they made from the county jail were being recorded. Contrary to Bill-ups’s contention on appeal, he had no reasonable expectation of privacy when he made telephone calls from the county jail. Therefore, the circuit court did not abuse its discretion by admitting the audio recordings of Billups’s telephone conversations into evidence at trial.
 

 Penalty-Phase Issues
 

 IV.
 

 Billups contends that the circuit court erred by allowing the State, during the penalty phase of Billups’s trial, to present what he characterizes as irrelevant and prejudicial evidence regarding the murder of Steven Lockett, whose murder Billups had been charged with but not yet convicted of before his trial here.
 
 [3]
 
 
 *132
 
 Billups contends that the State had no basis for submitting evidence regarding Lockett’s murder because, he argues, the evidence was not relevant to any aggravating circumstance set out in § 13A-5^49, Ala.Code 1975, but instead was a nonstatu-tory aggravating circumstance. Specifically, Billups contends that the State offered evidence of Lockett’s murder to establish the aggravating circumstance under § 13A-5-49(10), Ala.Code 1975, that the capital offense was one of a series of intentional killings committed by Billups.
 
 [4]
 

 During the penalty phase of Billups’s trial, the State presented evidence that on December 13, 2003 — three days before the multiple murders in this case — the badly burned body of Steven Lockett was found in a pick-up truck that had been burned. An autopsy of Lockett’s body determined that the cause of his death was multiple gunshot wounds, including one to the back of his head. Lockett had been seen with Billups on several occasions before the murder. The last calls made on Lockett’s cellular telephone were made to a telephone number used by Billups. During a search of Billups’s house in January 2004, police discovered blood in the kitchen of Billups’s house that was later identified as Lockett’s blood. The police also discovered a 9mm handgun in Billups’s house belonging to Lockett. According to Lock-ett’s girlfriend, Lockett carried the gun with him at all times. The evening before his body was discovered, Lockett left his girlfriend’s house with $5,400 cash in his possession. Based on the evidence accumulated during the police investigation of Lockett’s murder, Billups was indicted for Lockett’s murder. Billups had not yet been tried for Lockett’s murder at the time of the trial for the four murders here.
 

 The admissibility of evidence at the jury sentencing hearing in a capital case is governed by §§ 13A-5-45(c) and (d), Ala. Code 1975. “At the sentencing hearing evidence may be presented as to any matter that the court deems relevant to the aggravating and mitigating circumstances referred to in Sections 13A-5-49, 13A-5-51 and 13A-5-52.” § 13A-5-45(c), Ala. Code 1975. Section 13A-5^45(d), Ala.Code 1975, provides: “Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements.” Under the provisions of §§ 13A-5-45(c) and (d), the strict rules of evidence are not applicable to sentencing hearings. See
 
 Stephens v. State,
 
 580 So.2d 11, 23 (Ala.Crim.App.1990).
 

 In the present case, the evidence presented by the State was both probative and relevant to show Billups’s propensity for violence. See
 
 Siebert v. State,
 
 562 So.2d 586, 597-98 (Ala.Crim.App.1989) (evidence of violence of defendant’s prior manslaughter offense was both relevant and probative in penalty phase of trial). See also
 
 Ex parte Loggins, 771
 
 So.2d 1093, 1103 (Ala.2000) (“ ‘evidence is relevant if it has any probative value, however slight, upon a matter at issue in the case’ ”).
 

 Because the evidence of Lockett’s murder was admissible to prove Billups’s propensity for violence, we find no merit to
 
 *133
 
 Billups’s claim that the circuit court erred in admitting evidence of Lockett’s murder to prove the aggravating circumstance set out in § 13A-5-49(10), Ala.Code 1975, namely that “[t]he capital offenses in this case were one of a series of intentional killings committed by the defendant.” Although the circuit court instructed the jury on the aggravating circumstance set out in § 13A-5-49(10), the court stated in its sentencing order that it did not find the existence of this particular aggravating circumstance. In addressing this aggravating circumstance, the court stated:
 

 “Whether the capital offense was one of a series of intentional killings committed by the Defendant — this aggravating circumstance
 
 does not
 
 apply. The State of Alabama sought to prove this aggravating circumstance by showing that [Billups] was also guilty of the murder of Steven Lockett. Steven Lockett’s body was found burned in a pick-up truck on December 13, 2003, three days before the quadruple homicide in which [Billups] has been convicted. There was testimony that Steven Lockett was killed from multiple gunshot wounds, including one to the back of his head. There was testimony during the penalty phase that blood found at [Billups’s] residence belonged to Steven Lockett. Lockett’s girlfriend had seen [Billups] with Lockett on prior occasions. The last calls made on Lockett’s cell phone were made to a number used by [Bill-ups]. A nine millimeter firearm found in Kenneth Billups’s house was a firearm belonging to Lockett that he took with him on the night he was shot. At trial, there was testimony that a shell casing found near where Steven Lock-ett’s blood was found in Kenneth Bill-ups’s house was shot from the same firearm that was also used during the incident in question. Although there was substantial evidence that Kenneth Billups was involved in the murder of Steven Lockett, and the Court believes the jury could have found beyond a reasonable doubt that this aggravating circumstance existed based upon [its] finding that Kenneth Billups committed the four murders in question and the murder of Steven Lockett three days earlier, the Court does not know the jury’s actual finding as it relates to this aggravating circumstance. Although the Court proposed a special verdict form for the jury to outline [its] findings regarding aggravating circumstances, no such form was submitted to the jury when one or both of the parties objected. Since Mr. Billups has not been convicted in the death of Steven Lockett and there is a possibility that someone other than Bill-ups could have committed that offense, the Court does not find that this is an aggravating circumstance.”
 

 (C. 69.)
 

 Assuming without deciding that it would have been error for the circuit court to find the existence of an aggravating circumstance under § 13A-5-49(10), the error would not require a reversal of Bill-ups’s convictions, given the number of other statutory aggravating circumstances supporting the imposition of the death sentence. See
 
 Edwards v. State,
 
 515 So.2d 86 (Ala.Crim.App.1987) (holding that application of nonstatutory aggravating circumstance did not necessitate reversal where a statutory aggravating circumstance to uphold the sentence of death was also present).
 

 Moreover, because the harmless-error rule applies to sentencing hearings in capital cases,
 
 Ex parte Whisenhant,
 
 482 So.2d 1241, 1244 (Ala.1983), reversal is not
 
 *134
 
 warranted in this case.
 
 [5]
 
 The harmless-error rule provides, in pertinent part:
 

 “No judgment may be reversed or set aside ... on the ground of ... improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
 

 Rule 45, Ala. R.App. P.
 

 In
 
 Chapman v. California,
 
 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court held that before the violation of certain constitutional rights can be held to be harmless, the appellate court must be able to declare a belief that it was harmless beyond a reasonable doubt. “The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.”
 
 Davis v. State,
 
 718 So.2d 1148, 1164 (Ala.Crim.App.1997), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).
 

 This Court has previously held that in instances when testimony has been erroneously admitted into evidence, that testimony can be rendered harmless by the admission of lawful evidence that tends to demonstrate the same facts. In
 
 McNabb v. State,
 
 887 So.2d 929 (Ala.Crim.App.2001), aff'd, 887 So.2d 998 (Ala.2004), this Court explained:
 

 “ ‘ “[Testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.”’
 
 Jackson v. State,
 
 791 So.2d 979, 1013 (Ala.Crim.App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001), quoting
 
 White v. State,
 
 650 So.2d 538, 541 (Ala.Crim.App.1994), overruled on other grounds,
 
 Ex parte Rivers,
 
 669 So.2d 239 (Ala.Crim.App.1995). See also,
 
 Dawson v. State,
 
 675 So.2d 897, 900 (Ala.Crim.App.1995), aff'd 675 So.2d 905 (Ala.1996) (‘The erroneous admission of evidence that is merely cumulative is harmless error.’); and
 
 Thompson v. State,
 
 527 So.2d 777, 780 (Ala.Crim.App.1988) (‘Testimony which may be apparently illegal upon admission may be rendered prejudicially innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.’).”
 

 887 So.2d at 971.
 

 Although we recognize that the harmless-error rule is to be applied with extreme caution in capital cases, see
 
 Ex parte Whisenhant,
 
 482 So.2d 1247, 1249 (Ala.1984), we nevertheless find the harmless-error rule applicable here. The evidence established that Billups had a criminal history that consisted of three convictions for robbery in the first degree. A victim of a robbery of which Billups had been convicted testified at the sentencing hearing that Billups had robbed her while holding a gun to her head. The robbery victim’s testimony tended to prove the same fact that the testimony regarding Lockett’s murder proved, i.e., Billups’s propensity for violence. Further, given the totality of the
 
 *135
 
 evidence presented, we cannot say that Billups was prejudiced to the point of calling into question the validity of his sentences.
 

 Accordingly, no basis for reversal exists as to this claim.
 

 V.
 

 Lastly, Billups contends that Alabama’s death-penalty statute violates his due-process rights. Specifically, Billups argues that the statute fails to narrow the class of death-eligible offenders and is, therefore, arbitrary. Billups asserts that approximately two-thirds of the death sentences imposed in Alabama are based on the aggravating factor of robbery, thus demonstrating the inability of Alabama’s capital-sentencing scheme to meaningfully narrow the offenses which may be death eligible.
 

 This Court has previously addressed and rejected this contention. In
 
 Ex parte Woodard,
 
 631 So.2d 1065 (Ala.Crim.App.1993), we stated:
 

 “ ‘A capital sentencing scheme must, in short, provide a “ ‘meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.’ ”
 
 [Gregg v. Georgia,
 
 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) ], quoting
 
 Furman v. Georgia,
 
 [408 U.S. 238, 313, 92 S.Ct. 2726, 2763, 33 L.Ed.2d 346 (1972) ](White, J., concurring).
 

 “ ‘This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.’
 

 “Godfrey v. Georgia,
 
 446 U.S. 420, 427-428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398, 406 (1980).
 

 “Alabama’s capital offense statute includes a sentencing scheme that is neither arbitrary nor capricious.
 
 Ex parte Hays,
 
 518 So.2d 768, 774 (Ala.1986);
 
 Daniels v. State,
 
 534 So.2d 628, 642-45 (Ala.Cr.App.1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987).
 

 “ ‘The Supreme Court has required heightened reliability in the imposition of the death penalty, but the Court has not mandated any particular state statutory approach to capital punishment. To minimize the risk of arbitrary action and provide individualized sentencing, however, the Court has imposed two general requirements on the capital sentencing process. First, a state must channel the sentencer’s discretion in order to “genuinely narrow the class of persons eligible for the death penalty and ... [thus] reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.” Second, the State may not limit the sentencer’s consideration of any relevant evidence that might lead the sentencer to decline to impose the death penalty.
 

 “‘The required narrowing of the class of death-eligible defendants may occur at either the guilt or the sentencing phase of a capital trial. When narrowing is accomplished during the sentencing phase, the sentencer determines whether certain characteristics of the crime, known as aggravating circumstances, distinguish the gravity of the offense so as to justify the imposition of the death penalty.’
 

 “Daniel F. Mclnnis et ah, Project,
 
 Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992,
 
 81 Geo.LJ. 853, 1471-73 (1993) (footnotes omitted).”
 

 
 *136
 

 Ex parte Woodard,
 
 631 So.2d at 1069-70. See also
 
 Vanpelt v. State,
 
 74 So.3d 32, 50 (Ala.Crim.App.2009);
 
 McGowan v. State,
 
 990 So.2d 931, 996 (Ala.Crim.App.2003); and
 
 Johnson v. State,
 
 823 So.2d 1, 51-52 (Ala.Crim.App.2001).
 

 Thus, this issue has previously been considered and rejected by this Court, and no basis for reversal exists as to this claim.
 

 Sentencing Order
 

 As required by § 13A-5-53, Ala.Code 1975, this Court must review the propriety of Billups’s capital-murder convictions and death sentences.
 

 Billups was convicted of murdering Gomez, Marquez, Salcedo, and Perez-during the course of a first-degree robbery, § 13A-6-40(a)(2), Ala.Code 1975; during the course of a first-degree kidnapping, § 13A-5-40(a)(l), Ala.Code 1975; during the course a first- or second-degree burglary, § 13A-5-40(a)(4), Ala.Code 1975; and by killing Gomez, Marquez, Salcedo, and Perez by one act or pursuant to one scheme or course of conduct, § 13A-5-40(a)(10), Ala.Code 1975.
 

 The record indicates that Billups’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala. Code 1975.
 

 The circuit court found that the aggravating circumstances outweighed the mitigating circumstances. In its sentencing order, the circuit court found the existence of eight statutory aggravating circumstances: (1) that the capital offenses were committed while Billups was on parole for the commission of a felony offense, see § 13A-5-49G), Ala.Code 1975; (2) that Billups had been previously convicted of another felony involving a threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975; (3) that Billups knowingly created a great risk of death to many persons, see § 13A-5^49(3), Ala.Code 1975; (4) that the capital offenses were committed during the course of a first-degree robbery, see § 13A-5-49(4), Ala. Code 1975; (5) that the capital offenses were committed during the course of a first- or second-degree burglary, see § 13A-5^9(4), Ala.Code 1975; (6) that the capital offenses were committed during the course of a first-degree kidnapping, see § 13A-5-49(4), Ala.Code 1975; (7) that the capital offenses were especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975; and (8) that Billups intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct, see § 13A-5-49(9), Ala.Code 1975.
 

 The circuit court found no statutory mitigating circumstances. In accordance with § 13A-5-52, Ala.Code 1975, the court considered nonstatutory mitigating circumstances and stated:
 

 “The Court notes that [Billups] did not cause any trouble in court, but this is diminished by evidence that [Billups] made phone calls from the jail in an attempt to set-up false alibi witnesses. Although the phone calls are not considered as an aggravating circumstance, they weigh against any weight that may have been given based upon [Billups’s] proper behavior in court. The defense also submitted testimony that [Billups] did not receive any disciplinaries when he was previously in prison, that he had attended cooking school and obtained his GED while in prison. The Court finds that these factors add little, if any, weight in mitigation on behalf of [Bill-ups].”
 

 (C. 70.) The circuit court weighed the aggravating circumstances against the mitigating circumstances, or lack of mitigating
 
 *137
 
 circumstances, and determined that the aggravating circumstances outweighed the mitigating circumstances and sentenced Billups to death.
 

 The circuit court’s finding that the capital offenses were committed while Billups was on parole for the commission of a felony offense is supported by the testimony of Phillip Merriweather, Billups’s parole officer, who testified that Billups was placed on parole in 2001 and that his sentence of parole was not scheduled to end until 2013. The circuit court’s finding that the capital offenses were committed after Billups had previously been convicted of another capital offense or of a felony involving the use or threat of violence to the person is supported by the evidence. The State’s proof of Billups’s 1992 convictions for first-degree robbery — i.e., armed robbery — supports a finding of this aggravating circumstance. See
 
 Hadley v. State,
 
 575 So.2d 145, 156 (Ala.Crim.App.1990), aff'd on return to remand, 588 So.2d 938 (Ala.Crim.App.1991) (“Historically, offenses which have been found to uphold [§ 13A-5-49(2) ] include: armed robbery....”). The circuit court’s finding that in committing the capital offenses Billups knowingly created a great risk of death to many persons is supported by the evidence that six individuals were in the apartment when the shooting occurred. See
 
 Wilson v. State,
 
 777 So.2d 856, 921 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001) (holding that defendant’s conduct created a risk to seven people who were in one room, counting the four decedents and therefore was undeniable proof that the defendant created a great risk of death to many persons).
 

 With regard to the application of the aggravating circumstance that the murders were especially heinous, atrocious, or cruel, the circuit court made the following findings of fact:
 

 “Evidence established that four people were brutally murdered by [Billups] and his accomplices on December 16, 2003. Four victims, and two individuals who escaped, sat there briefly with guns pointed at them knowing they would probably be killed. As the shooting began, some of the individuals watched as their friends were gunned down. Testimony established that at least one of the individuals tried to get up after the shooting, but [he was] again shot down. Testimony of Gary Simmons, a forensic pathologist with the ... Coroner’s Office, established that Rafael Salcedo received two gunshot wounds to the head and neck area. Enrique Marquez had multiple gunshot wounds, including one shot to the back of the head. Some of these wounds would have caused debilitation, but Dr. Simmons was not of the opinion that they were instantly debilitating even though they were the cause of Salcedo’s death. Manuel Nunez Perez received three gunshot wounds to his head and back. Wilbur Gomez received a shot in the lower back of his head which went through his brain. It is clear that some of the individuals were forced to watch or try to escape as their friends were being killed, and if the individuals lived through their first wound they were meticulously executed by Kenneth Billups and one or more of his accomplices.”
 

 (C. 69.)
 

 In
 
 Taylor v. State,
 
 808 So.2d 1148 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002), we addressed the application of this aggravating circumstance. We find the following language to be particularly relevant to this case:
 

 
 *138
 
 “The Alabama appellate courts’ interpretation of ‘especially heinous, atrocious, or cruel’ has passed muster under the Eighth Amendment because those courts have consistently defined the term to include only ‘those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’
 
 Ex parte Clark,
 
 [728 So.2d 1126 (Ala.1998) ], citing,
 
 Lindsey v. Thigpen, 875
 
 F.2d 1509 (11th Cir.1989). The Alabama appellate courts have considered the infliction of psychological torture as especially indicative that the offense was ‘especially heinous, atrocious or cruel.’ Thus, the mental suffering where a victim witnesses the murder of another and then realizes that soon he or she will also be killed, has been found to be sufficient to support a finding of this aggravating circumstance.
 
 Norris v. State,
 
 793 So.2d 847, 854 (Ala.Cr.App.1999). As the trial judge pointed out in his sentencing order, two of the victims here witnessed Taylor kill another victim. Both tried to run and hide, but were captured. Both begged and pleaded for them lives; one offering money and property, the other pleading for the sake of her children. Both were deliberately and methodically executed with a gunshot to the head as they pleaded for their lives. These murders were not accomplished in a rapid-fire manner; there was sufficient time between the three murders for the next victim to be placed in significant fear for his or her life, and the evidence is clear that each was well aware of what was about to happen.”
 

 808 So.2d at 1169.
 

 Here, just as in
 
 Taylor,
 
 there was sufficient time in between each of the murders for the remaining victims to realize their own fates. The circuit court properly concluded that the murder of the four victims was “especially heinous, atrocious, or cruel.” See
 
 Ex parte Clark,
 
 728 So.2d 1126, 1140 (Ala.1998).
 

 The circuit court’s findings that the murders were committed during the commission of first-degree robbery, first- or second-degree burglary, first-degree kidnapping, and by one act or pursuant to one scheme or course of conduct are supported by the jury’s verdict during the guilt phase of Billups’s trial. This Court has held that: “If the actions committed during the course of the murder support the finding that more than one of the enumerated underlying felonies was committed, then a trial court may apply § 13A-5^9(4) more than once.”
 
 Hodges v. State,
 
 856 So.2d 875, 889 (Ala.Crim.App.2001). The circuit court’s findings regarding statutory and nonstatutory mitigating circumstances are likewise supported by the record. We agree with the circuit court’s findings.
 

 Pursuant to § 13A-5-53(b)(2), Ala.Code 1975, this Court must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Billups’s death sentence. After independently weighing those circumstances, we are convinced that death is the appropriate sentence in this case. See § 13A-5-53(b)(2), Ala.Code 1975.
 

 Further, as required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether Billups’s death sentence was disproportionate to the sentences imposed in similar cases. Billups’s sentence was not. See, e.g.,
 
 Sharifi v. State,
 
 993 So.2d 907, 950 (Ala.Crim.App.2008) (multiple murders by one act, scheme, or course of conduct);
 
 Flowers v. State,
 
 922 So.2d 938, 961 (Ala.Crim.App.2005) (kidnapping/murder);
 
 Walker v. State,
 
 932 So.2d 140, 162 (Ala.Crim.App.2004) (burglary/murder); and
 
 Smith v. State,
 
 795 So.2d 788, 842 (Ala.Crim.App.2000) (robbery/murder).
 

 
 *139
 
 Finally, we have searched the record for any error — plain, preserved, or otherwise — that may have adversely affected Billups’s substantial rights and have found none. See Rule 45A, Ala. RApp. P.
 

 For the foregoing reasons, Billups’s capital-murder convictions and his sentence of death are due to be affirmed.
 

 AFFIRMED.
 

 WISE, P.J., and WELCH and MAIN, JJ., concur. WINDOM, J., concurs in the result.
 

 [1]
 

 . This case was originally assigned to another member of this Court. It was reassigned to Judge Kellum on May 5, 2009. Although Judge Kellum was not a member of this Court when this case was orally argued, she has reviewed the audiotapes and videotapes of oral argument.
 

 [2]
 

 .
 
 New Jack City
 
 was a movie released in 1991 about a rising drug dealer/crime lord in New York City, containing multiple depictions of graphic violence. A clip of the movie was offered into evidence by the prosecutor but was not admitted.
 

 [3]
 

 . Billups was subsequently convicted of murdering Lockett during the commission of a first-degree robbery, and he was sentenced to death. This Court affirmed Billups’s conviction and sentence on direct appeal. See
 
 Bill-
 
 
 *132
 

 ups
 
 v.
 
 State,
 
 [Ms. CR-05-1767, November 13, 2009] — So.3d - (Ala.Crim.App.2009).
 

 [4]
 

 . During oral argument, Billups was asked to file a supplemental brief regarding this issue. Billups filed a supplemental brief, expanding his original argument as to this issue; he also raised eight additional issues. On January 16, 2008, this Court struck the eight new issues and accepted that part of the brief pertaining to the amended issue.
 

 [5]
 

 . After the Alabama Supreme Court released
 
 Whisehhant,
 
 the United States Supreme Court held that a harmless-error analysis applies even to the jury's consideration of an erroneous aggravating circumstance.
 
 Clemons v. Mississippi,
 
 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); see also
 
 Brooks v. State,
 
 973 So.2d 380 (Ala.Crim.App.2007).